Alison PALMER, et al., Plaintiffs,

v.

George P. SHULTZ, Defendant.

Marguerite COOPER, et al., Plaintiffs,

v.

George P. SHULTZ, Defendant.

Civ. A. Nos. 76–1439, 77–2006.

United States District Court,
District of Columbia.

Dec. 21, 1984.

Ellen K. Wayne, Bruce J. Terris, Terris & Sunderland, Washington, D.C., for plaintiffs.

Asst. U.S. Atty. Diane Sullivan, Washington, D.C., for defendant.

## MEMORANDUM

JOHN LEWIS SMITH, Jr., District Judge.

This matter is presently before the Court on defendant's motion for reconsideration of this Court's September 17, 1984 Memorandum Opinion granting, pursuant to § 706(k) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(k), plaintiffs fees and costs in the amount of $439,-541.48. 594 F.Supp. 433. The government moves for reconsideration in light of the Court of Appeals decision in *Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4 (D.C. Cir.1984), which delineates the standards to be used in calculating attorney's fee awards to "for-profit" firms. Upon careful review of the record, and of recent developments in the law, the defendant's motion for reconsideration is granted and plaintiffs are awarded $147,807.25.

In the September 17 Memorandum Opinion (Mem.Op.), this Court properly determined that "[t]he initial task in determining an appropriate fee award ... is to establish the 'lodestar': the number of hours expended multiplied by a reasonable hourly rate." Mem.Op. p. 3, quoting *National Association of Concerned Veterans v. Secretary of Defense*, 675 F.2d 1319, 1323 (D.C.Cir. 1982) (citing *Copeland v. Marshall*, 641 F.2d 880, 891 (D.C.Cir.1980) (*en banc*) (*"Copeland III"*)). As there was no dispute as to the "number of hours expended" by plaintiffs, Mem.Op. pp. 3–4, the Court was left to calculate a "reasonable hourly rate." This Court examined the actual rates charged by plaintiffs but concluded that the "market value" of counsels' services was more accurately reflected in "prevailing community rates." The Court found that plaintiffs' proposed rate schedule "was consistent with 'prevailing community rates' and appropriate for use in calculating the lodestar." Mem.Op. p. 9. The Court rejected the government's argument that the use of current rates represented a claim for interest barred by sovereign immunity, instead finding that section 706(k) is a statutory waiver of sovereign immunity. Mem.Op. p. 10. In addition, the Court, finding that the facts of this particular application met the criteria established by *Blum v. Stenson*, —— U.S. ——, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), and *Murray v. Weinberger*, 741 F.2d 1423 (D.C.Cir. 1984), ordered that the merits lodestar be adjusted upward by 20% to reflect the uncertainty that existed at the commencement of the suit, the so-called contingency multiplier. All told, this Court awarded

plaintiffs $439,541.48, which included a fee litigation lodestar of $63,901.25, a final merits award of $337,669.20, and $37,-971.03 as reimbursement for reasonable litigation expenses.

The relevant portions of the *Laffey* decision concern the hourly rate component of the lodestar calculation. The Court of Appeals drew a distinction between nonprofit and for-profit firms, holding that a private firm's customary hourly rate, not the rates charged by other attorneys in the community, should be used in calculating a lodestar fee for a prevailing party under a fee-shifting statute. *Laffey*, at 30. The Circuit Court was concerned with avoiding "a second major litigation" that often accompanies a court's "essentially impossible task of selecting one rate over another from a wide range of 'market' rates." *Id.* at 18. The Court of Appeals recognized that while the "prevailing market rate" may be "a necessary evil" when a nonprofit firm is involved, it can be dispensed with where a private, for-profit law firm has established market rates for similar services.

■ Before dealing with the merits, the Court must first address plaintiffs' procedural objection to the motion. Plaintiffs assert that *Laffey* is merely a reaffirmation of current case law, not a change in law, and that defendant has waived any opportunity to argue that Terris and Sunderland's normal billing rate is the appropriate market rate by the failure to assert this position in earlier proceedings. This contention is without merit. The Court of Appeals decision in *Laffey* constitutes a significant change in the law and this Court must now decide how this change is applicable to the instant case.

■ The first issue before the Court is whether Terris and Sunderland's normal billing rate constitutes an established market rate as defined by *Laffey* that should be used in computing the lodestar fee. Defendant contends that plaintiffs are no different than the quasi-public interest law firm involved in *Laffey* and should be subject to payment according to its "long standing history of market rates charged to clients." Def.Mem., p. 5. Defendant presents Terris and Sunderland as being no different than any ordinary private law firm.

Plaintiffs oppose this characterization, contending both that Terris and Sunderland is not a law firm with a "customary private practice" and that it has no firmly established billing rate. Plaintiffs point to the distinctions that exist between Bredhoff & Kaiser, the firm seeking fees in *Laffey*, and Terris and Sunderland to illustrate that it has a different practice. The two most noteworthy distinctions include the fact that Terris and Sunderland has no "partnership track" where lawyers can expect to eventually become partners and the firm bills at a flat rate, with no consideration made for an attorney's experience or qualifications. Plaintiffs further argue that they have no established billing rate; instead their rates are set "at levels that will allow it to provide representation to individuals and groups who could not afford counsel at full market rates." Pl.Mem., p. 10. Plaintiffs, thus, contend that Terris and Sunderland is a public interest law firm with no established billing rate, and not subject to the holding of *Laffey*.

The Court disagrees with plaintiffs' contention. Sufficient evidence is available to conclude that Terris and Sunderland has an established billing rate, presently set at $80 per hour for partners and $65 per hour for associates. Terris Dep. at 14. It is clear that the $80/65 rate is charged to all clients unless two conditions exist: the client cannot pay and attorney fees can be obtained under an applicable statute. Terris Dep. at 13. Plaintiffs only infrequently encounter a situation where their normal fees are reduced. Terris Dep. at 10–11. At all other times, plaintiffs charged their clients their normal rates.

Plaintiffs argue that this rate does not qualify as an "established billing rate" because it fails to reflect the market value of the firm's legal services but instead reflects a choice "to cater[ ] to people who have very limited sums of money." Terris

Dep. at 29. The Court of Appeals in *Laffey* discounted a similar argument, stating that "the fact that [the applicant's] clients cannot afford unlimited legal fees fails to distinguish them." *Laffey*, at 14 n. 69. Plaintiffs have chosen "to cater" to a particular segment of the market by using lower rates, thereby avoiding competition from the "premium" firms whose high rates could not be paid by plaintiffs' clients. The Court finds that plaintiffs do indeed have an established billing rate, $80 per hour for partners and $65 per hour for associates, which results in a merits lodestar of $181,820.15 and a fee litigation lodestar of $40,400.00.

■ Though adopting a rate less than that included in the original award, the Court is convinced that this case is one of the "rare cases" referred to in *Blum*, 104 S.Ct. at 1549, where an upward adjustment based on quality of representation is entirely appropriate. Though *Blum* indicated that "the quality of representation ... generally is reflected in the reasonable hourly rate," the Supreme Court pointed out that quality of representation "may justify an upward adjustment only in the rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was 'exceptional'." *Id.*

In the September 17 Memorandum this Court specifically noted that plaintiffs' work product "[had] been superior throughout," Mem.Op. p. 8, and made an award at hourly rates "equal to or below prevailing market rates in the District of Columbia for lawyers of similar skill and experience." Mem.Op. p. 9. Explicit in the calculation of the award at prevailing market rates was that plaintiffs' services were equal in quality to those of attorneys charging that rate, thus clearly indicating that plaintiffs' services were far superior to what could be reasonably expected of attorneys charging a maximum of $65 per hour for associates and $80 per hour for partners. This Court has already described

the relief achieved as "exceptional" within the meaning of *Blum*, albeit in a different context. Mem.Op. pp. 13, 16–17. The relief achieved through entry of the Consent Decree was indeed exceptional, substantially eliminating seven previous years of hiring disparities, and carrying a conservatively estimated monetary value of $8.6 million. Pl.App. 4–6. In view of plaintiffs' superior services and exceptional success, the Court believes that the merits lodestar should be adjusted upwards by 54.75%, producing an enhancement of $99,546.53.

Defendant also questions this Court's use of a contingency multiplier in the original award where the odds of success were estimated to be 75%, pointing to the *Laffey* court's rejection of a multiplier where it was held that there was a 50% chance of success. Defendant misreads the September 17 Memorandum and *Laffey* in reaching this conclusion. While the Court of Appeals did state that "[a]ny crude multiplier derived simply from the plaintiff's chance of success must be rejected as contrary to the congressional scheme," *Laffey*, at 28, the Court stopped short of declaring the impropriety of a contingency "enhancement" in every case. *Id.* at 27–28. The Court in *Laffey* did hold that an insufficient showing had been made by plaintiffs' counsel to qualify as an exceptional case pursuant to *Blum*. *Id.* at 28.

This Court in its September 17 Memorandum went beyond merely examining the chance of success in awarding a contingency adjustment to plaintiffs. This Court found, pursuant to *Blum* and *Murray*, that this was an exceptional case worthy of a contingency adjustment. The specific circumstances justifying the enhancement enumerated in the September 17 Memorandum bear repeating here.

Both legal and factual complexity and uncertainty existed at the commencement of this suit. For example, on the critical issue of employment test validation, there was no legally preferred method of validation, and plaintiffs had no knowledge of whether defendant in fact employed validation procedures.

That remained to be uncovered through discovery. Furthermore, plaintiffs' counsel were obviously committing significant time and resources, particularly in view of the firm's small size. Class actions involve efforts beyond those associated with an ordinary lawsuit, and the massive statistical evidence required expert (and expensive) analysis. It appears to the Court that a contingency adjustment is "necessary to facilitate the filing" of cases of this type, where both the scope of the claims and the number of complainants are atypical.

Mem.Op. pp. 16–17 (citations omitted). Unlike *Laffey*, plaintiffs' counsel did make sufficient showing to qualify as an exceptional case.

The reasoning used by this Court in the original award for granting the contingency adjustment is not changed by *Laffey*. While the September 17 Memorandum does make mention of the district court decision in *Laffey v. Northwest Airlines*, 572 F.Supp. 354 (D.D.C.1983), the reasoning used there, based on *Blum* and *Murray*, would stand even were those references to *Laffey* excised from the opinion. Consequently, for the reasons cited by the Court here and in the September 17 Memorandum, the risk of nonpayment undertaken by counsel in this case is "exceptional" within the meaning of *Blum* and *Murray*, and a 20% enhancement, totaling $36,-364.03, is awarded.

The Court finds it unnecessary to address the propriety of its award of $37,-971.03 as reimbursement for reasonable litigation expenses. In addition, *Laffey* expressly approves the use of current rates against federal defendants to counterbalance the delay in payment as well as to simplify the task of the district court. *Laffey*, at 20 n. 104. These portions of the original award remain intact.

■ Plaintiffs have submitted a supplemental application for an award of attorney's fees and expenses arising incident to litigating the motion for reconsideration. Included in this application is a request for fees for time expended litigating plaintiffs'

original application for attorney's fees. Plaintiffs are not entitled to compensation for the 10.75 hours associated with litigating their original application. Any compensation for those hours should have been presented to the Court in time to have been considered in the September 17 Memorandum. The Court's consideration of defendant's motion was not intended to provide plaintiffs with a second opportunity to obtain fees for hours not included in their original application.

■ The Court must next determine what portion of the remaining hours was reasonably expended litigating the applicability of *Laffey*. *Copeland III*, 641 F.2d at 891. Plaintiffs have provided sufficient documentation so that the Court can make an independent determination as to whether or not the hours claimed are justified. The Court finds that the hours submitted by plaintiffs, except those categorized as research and miscellaneous, should be reduced by one third. This leaves plaintiffs with 99.5 hours billable to associates and 9.75 to partners. As previously established, the proper hourly rate to be used in calculating the lodestar fee is $65 for associates and $80 for partners. With expenses, this Court finds reasonable a fee litigation lodestar of $9,367.72.

Accordingly, defendant's motion for reconsideration is granted and plaintiffs are entitled to a total payment of $405,469.46. This figure represents a total merits lodestar of $317,730.71 ($181,820.15 plus the 54.75% quality enhancement, $99,546.53, and the 20% contingency enhancement, $36,364.03), a fee litigation lodestar from the original application of $40,400.00, $37,-971.03 for expenses, and $9,367.72 in fees for litigating the motion for reconsideration. As defendant has already been ordered to pay $257,662.21, plaintiffs are awarded an additional amount of $147,-807.25.

An appropriate order follows.