**Alison PALMER, et al., Plaintiffs,**

v.

**George P. SHULTZ, Defendant.**

**Marguerite COOPER, et al., Plaintiffs,**

v.

**George P. SHULTZ, Defendant.**

**Civ. A. Nos. 76–1439, 77–2006.**

United States District Court,
District of Columbia.

Sept. 17, 1984.

Ellen Wayne, Terris & Sunderland, Washington, D.C., for plaintiffs.

Diane M. Sullivan, Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM

JOHN LEWIS SMITH, Jr., Senior District Judge.

This matter is before the Court on plaintiffs' application for an award of attorney's fees and expenses under § 706(k) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(k). In applications filed December 12, 1983, and July 12, 1984, plaintiffs request a total of $450,797.12 in fees and expenses. The request arises from a class action against the Department of State, in which plaintiffs alleged wide-

spread sex discrimination by defendant with respect to employment practices in the Foreign Service. On October 12, 1983, some seven years after suit was filed, this Court approved a consent decree settling the portion of the case involving applicants for junior-level Foreign Service positions. That decree supplies the basis for plaintiffs' claim that they are the "prevailing party" and thereby entitled to an award under § 706(k).

This is an unusual case. Major pieces of Title VII litigation often produce major pieces of attorney's fees litigation. The substantive standards involve resolution of numerous factual issues, subsumed under this analytical heading or that, all litigable, and all subject to an imprecise test of "reasonableness." The procedural standards, most thoroughly set out by the Court of Appeals in *National Association of Concerned Veterans v. Sec'y of Defense*, 675 F.2d 1319 (D.C.Cir.1982), require detailed documentation of the attorney's efforts, and establishment through affidavit of a "prevailing market rate" in a "market" that really does not exist. The result is often lengthy records, lengthy proceedings, and lengthy "opinions" where the Court not so much opines but rather acts as a blackrobed bookkeeper. It is not surprising that judges frequently decry the entire process.

This case is not like that. The issues are few in number, and legal in character. The government offers no opposition on several key questions. It concedes that plaintiffs are the prevailing party. It does not challenge in any respect the "reasonableness" of the hours claimed by plaintiffs. It provides but four pages of evidence of prevailing market rates. For their part, plaintiffs base their request for a multiplier on only one of the three grounds generally accepted as supporting an adjustment to the lodestar. The parties join issue on only three matters: the prevailing market rate, the use of current market rates in claims against the government, and plaintiffs' entitlement to compensation for certain expenses. Upon careful review of the record, and of recent developments in the law, the Court concludes that plaintiffs are entitled to an award of $439,541.48.

### 1. The Lodestar: Appropriate Hourly Rate.

"The initial task in determining an appropriate fee award ... is to establish the 'lodestar': the number of hours expended multiplied by a reasonable hourly rate." *Concerned Veterans, supra,* 675 F.2d at 1323 (citing *Copeland v. Marshall,* 641 F.2d 880, 891 (D.C.Cir.1980) (*en banc*) ("*Copeland III*")). *See also Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). Defendant does not question the "number of hours expended" by plaintiffs' counsel, and with good reason: plaintiffs fully document and justify the hours claimed.[1] Defendant does challenge plaintiffs' requested hourly rates, and to that issue the Court now turns.

Seventeen different attorneys from Terris & Sunderland worked on this matter over the past eight years. The proposed rate schedule, based on years of experience, ranges from a high of $150 per hour

---

**1.** Plaintiffs claim a total of 2746.63 hours devoted to merits issues, and 642.25 hours to the fee litigation. The application carefully distinguishes between time devoted to the "employee" and to the "applicant" portions of the case, and offers a reasonable method for compensating efforts common to both claims. *See* Plts.Mem. at 13–19; First Terris Affidavit at ¶¶ 41–45; *cf. Hensley v. Eckerhart, supra,* 103 S.Ct. at 1940–41. Furthermore, counsel's "billing judgment," *id.* at 1940, as articulated and as applied, cannot be criticized. Counsel exercised it in a conscientious and fair manner throughout. *See* Plts. Resp.Interr. No. 15 (filed June 4, 1984); Terris

Depo. at 51–57 (filed June 10, 1984); Attachment D to Dec. 12 App. (contemporaneous time records).

As noted, defendant does not "challenge the accuracy and reasonableness of the hours charged." *Blum v. Stenson,* —— U.S. ——, 104 S.Ct. 1541, 1545 n. 5, 79 L.Ed.2d 891 (1984). Nonetheless, the Court has reviewed the record and reached an "independent determination [that all] the hours claimed are justified." *Concerned Veterans, supra,* 675 F.2d at 1327. *See also Wojtkowski v. Cade,* 725 F.2d 127, 130 (1st Cir.1984).

for Mr. Terris, to a low of $75 per hour for the most junior associates. *See* Plts.Mem. at 20. Because of the firm's policy of assigning primary responsibility at any given time to one or two associates, attorneys in the 4–7 and 8–10 year categories ($95–110) performed most of the work. *See id.;* First Terris Affidavit at ¶ 14.

■ Plaintiffs' proposed rate schedule is tested against this standard: "a reasonable hourly rate [is] that prevailing in the community for similar work." *Concerned Veterans, supra,* 675 F.2d at 1323 (citing *Copeland III, supra,* 641 F.2d at 1323). Defendant finds plaintiffs' proposal excessive. According to defendant, "similar work" means representation of plaintiffs in Title VII cases. "Prevailing rate" means the actual rate charged to plaintiffs by the applicant and by other Title VII attorneys. Defendant suggests that its own settlement policy, offering rates in a $45–75 range, more accurately reflects the true "prevailing community rate." *See* Def. Mem. at 2–3.

This approach is incorrect. The Supreme Court, the Court of Appeals, and this Court have rejected the various premises of defendant's argument, as well as its method of presentation. Needless to say, defendant's evidentiary offerings are of the sort expressly condemned in *Concerned Veterans:*

> "It should be recognized that fees awarded in other cases are probative of the appropriate community rate only if they were determined based on actual evidence of prevailing market rates, the attorneys involved had similar qualifications, and issues of comparable complexity were raised ...
>
> "A blunderbuss array of cases specifically selected to support a low hourly rate does not assist the District Court in determining the prevailing community rate. Carefully selected cases organized

in a meaningful fashion, on the other hand, would be extremely useful." *Concerned Veterans, supra,* 675 F.2d at 1325 n. 7.

■ Defendant's legal argument is also deficient. Defendant incorrectly limits the inquiry to the plaintiff's side of the "Title VII market." In 1983, this Court rejected the notion that there are "separate prevailing rates for the defense and prosecution of Title VII actions." *Laffey v. Northwest Airlines,* 572 F.Supp. 354, 374 (D.D.C. 1983). In 1984, the Supreme Court rejected the notion that subject-matter defines "similar work." The Court held that statutory fee awards are set according to the "same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases...." *Blum v. Stenson, supra,* 104 S.Ct. at 1546 (quoting S.Rept. No. 94–1011 p. 6, U.S.Code Cong. & Admin. News 1976 pp. 5908, 5913). The key aspect of a case is its complexity, not its cause, a proposition in accord with both the law and the views of practitioners (*see infra* note 3).

Defendant is correct in observing that the court must examine the actual rates charged by plaintiffs' counsel. *See Concerned Veterans, supra,* 675 F.2d at 1326 (actual rate "highly relevant proof of the prevailing community rate"). The cases, however, recognize that firms may charge rates that—"for whatever reason—do not reflect the full value of [their] services." *Laffey v. Northwest Airlines, supra,* 572 F.Supp. at 374. *See also Blum, supra,* 104 S.Ct. at 1547 & n. 11; *Concerned Veterans, supra,* 675 F.2d at 1326 n. 7a; *Copeland III, supra,* 641 F.2d at 900. Some firms, including plaintiffs' counsel, charge rates that are "reduced to reflect the financial constraints of their clientele," *Laffey, supra,* 572 F.Supp. at 373, and others—the "public interest" bar—charge nothing at all.[2] All agree that employment and civil

---

2. Named plaintiff Alison Palmer agreed to pay Terris & Sunderland rates of $25 per hour between 1976 and 1979 and $30 per hour from 1980 to present. *See* First Terris Affidavit at ¶ 6. The agreement specifically notes that the

rates are "below the ordinary market rate" and the firm agreed to them "only because of the limited financial resources of Ms. Palmer." Ms. Palmer has paid approximately $113,000 to the firm, and apparently continues to pay at the

rights litigation is frequently, if not typically, handled by such firms. *See* Def.Mem. at 3; Plts.Reply at 8. Defendant finds great meaning in this circumstance: "[j]ust as in any other market, if all or most consumers pay a lower cost, that 'reduced rate' is the market rate." Def.Mem. at 3. The Supreme Court, however, reached a different conclusion:

> "Congress did not intend the calculation of fee awards to vary depending on whether plaintiff was represented by private counsel or by a nonprofit legal services organization. The citations to *Stanford Daily* and *Davis* make this explicit. In *Stanford Daily*, the court held that it 'must avoid … decreasing reasonable fees because the attorneys conducted the litigation more as an act of *pro bono publico* than as an effort at securing a large monetary return.' 64 F.R.D. at 681." *Blum, supra,* 104 S.Ct. at 1547 (citations omitted).

The "lower costs" defendant points to are a function of the type of firm charging them. The type of firm after *Blum* is irrelevant. *Blum* thus seems to read much of the relevance out of an attorney's "actual charge," and nothing in *Concerned Veterans* precludes a court from examining the actualities of "actual rates." *Cf.* 675 F.2d at 1326 n. 7a. The *Blum* and *Laffey* cases make clear that actual rates do not necessarily reflect "market value," and market value is the touchstone of the fee inquiry.

▮ Market value is properly derived by evaluating the complexity of the litigation, and the "skill, experience, and reputation" of the attorney handling the matter. *Blum, supra,* 104 S.Ct. at 1547 n. 11. The focus then shifts to the community:

> "An applicant is required to provide specific evidence of the prevailing community rate for the type of work for which he seeks an award. For example, affidavits reciting the precise fees that attorneys with similar qualifications have received from fee-paying clients in comparable cases provide prevailing community rate information. Recent fees awarded by the courts or through settlement to attorneys of comparable reputation and experience performing similar work are also useful guides in setting an appropriate rate." *Concerned Veterans, supra,* 675 F.2d at 1325.

▮ Plaintiffs make all the showings necessary to justify the proposed rate schedule. There is no question that the case was and is complex. Defendant does not dispute it, and the record reveals it. The case involved across-the-board challenges to a particularly obscure personnel system. The procedural device was a class action. The substantive law was in flux. This case was no ordinary lawsuit.

There is also no question that the attorneys of Terris & Sunderland possess skill and experience in employment matters. Fifteen to twenty percent of the firm's caseload involves Title VII cases. *See* Plts. Resp.Interr. No. 24; First Terris Affidavit at ¶ 1; Attachment B to Dec. 12 App. Resumes of the individual attorneys who participated reveal substantial experience and interest in the area. Finally, the Court's own familiarity with the work-product of the firm confirms these observations. Their work has been superior throughout.

Plaintiffs supply considerable community information against which to compare their request. Affidavits from a number of Washington attorneys establish several points: 1) employment cases are as difficult to prosecute and defend as other types of federal litigation; 2) local lawyers charge the same fees for employment cases as they do in other cases; and 3) the rate schedule proposed by plaintiffs is, as plaintiffs observe, "equal to or below prevailing market rates in the District of Columbia for lawyers of similar skill and experi-

---

rate of $1,000 per month. *See* Plts.Resp.Interr. Nos. 2, 7; First Terris Affidavit at ¶ 6; Terris Depo. at 22. Terris & Sundereland also received fairly small voluntary contributions from other members of the class. *See* Terris Depo. at

22–24. The agreement also contains detailed provisions regarding distribution of any attorney's fees award or settlement. *See* Terris Depo. at 24–26.

ence." Plts.Mem. at 23.[3] Plaintiffs also describe fee awards in a number of other cases, including this Court's awards in *Laffey* and *Bachman v. Miller*, 567 F.Supp. 317 (D.D.C.1983).[4] All of these materials— unchallenged by defendant—support the Court's conclusion that plaintiffs' proposed rate schedule is consistent with "prevailing community rates" and therefore appropriately used in calculating the lodestar.

One final matter with respect to that calculation remains. Defendant argues that use of current rates, *i.e.*, 1984 rates for work done in 1979, represents an implicit claim for interest barred by sovereign immunity. *See* Def.Mem. at 6–8. The government cites numerous cases reciting the familiar rule that absent specific statutory waiver, interest cannot be awarded against the government. The government, however, does *not* cite ¶ 706(k), the statutory basis of plaintiffs' application:

> "(k) In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person."

█ Section 706(k) permits an award of "costs" to the prevailing party. It includes a "reasonable attorney's fee" as "part of the costs." It provides that the United States "shall be liable for costs the *same as a private person*." "Private persons" are not entitled to sovereign immunity.

"Private persons" who lose Title VII suits may be required to compensate the winner at current rates. *See, e.g., Laffey, supra,* 572 F.Supp. at 380–81. Section 706(k) is a statutory waiver of sovereign immunity, and current rates may be employed when calculating a fee award against the government. *See Murray v. Weinberger,* 741 F.2d 1423 at 1432–1433 (D.C.Cir.1984).[5] *See also Copeland III, supra,* 641 F.2d at 893 n. 23; *Concerned Veterans, supra,* 675 F.2d at 1329. The sovereign immunity bar on awards of interest simply is not applicable, and use of current rates is appropriate.

In sum, the Court finds reasonable a merits lodestar of $281,391, and a fee litigation lodestar of $63,901.25, for a final lodestar of $345,292.25. The next issue is whether an award above that amount is appropriate.

### 2. *Adjustments to the Lodestar: Contingent Nature of Success*

Plaintiffs urge that the merits lodestar be adjusted upward by 24% to compensate for the "contingent nature of the case." Prior to 1984, the theory and practice of the "contingency" or "risk of nonpayment" adjustment was fairly well-established. As the Court of Appeals explained, the adjustment is intended to "compensate for the risk that the lawsuit would be unsuccessful and that no fee at all would be obtained," because only prevailing parties are entitled to a statutory fee award. *Copeland III,*

---

3. For Point 1, *see* Affidavit of Richard B. Sobel at ¶¶ 7–13 (Attachment E); Affidavit of Barry L. Goldstein at ¶ 6 (Attachment F); Affidavit of James Robertson at ¶ 6 (Attachment U). For Point 2, *see id.*; Affidavit of Daniel A. Reznick at ¶ 7 (Attachment T). For Point 3, *see id.* at ¶¶ 13–14, 16; Robertson Affidavit at ¶ 8.

4. In *Laffey*, the Court awarded attorney's fees in the 4–7 and 8–10 year categories at $100 and $125, respectively. 572 F.Supp. at 371, 375. In *Bachman*, the Court awarded attorneys with five years experience $90. 567 F.Supp. at 321. *See also Plannells v. Howard University*, 34 FEP Cases 66, 68 (D.D.C. Feb. 17, 1984).

5. In *Murray v. Weinberger*, the Court of Appeals acknowledged but did not address the prejudgment interest/sovereign immunity theory ad-

vanced in opposition to a lodestar adjustment based on delay in payment. The Court apparently was not troubled by the argument's implications in the current rates context. Indeed, the Court expressly approved the use of current rates against the government to "counterbalance the delay in payment as well as simplify the task of the district court." *Id.* at 1433. *See also Copeland III, supra,* 641 F.2d at 893 n. 23; *Concerned Veterans, supra,* 675 F.2d at 1328–29. An "either-or" rule emerges from the cases: the applicant may calculate the lodestar according to current rates, or she may rely on historical rates and seek an adjustment for "delay in payment." The former approach is favored, and is appropriate here.

*supra*, 641 F.2d at 892. The analysis looks first to the terms of any fee arrangement between plaintiff and counsel, because an adjustment is "appropriate only if counsel would have received no significant remuneration if the suit were not successful." *Concerned Veterans, supra*, 675 F.2d at 1328. The inquiry then turns to the "specific circumstances" of the case, *id.*, supporting an adjustment, a test most thoroughly described in this Court's 1983 decision in *Laffey v. Northwest Airlines (see infra* at 439.).

Recent decisions by the Supreme Court and the Court of Appeals, however, cast doubt on the continuing validity of the contingency adjustment. In *Blum v. Stenson*, the Supreme Court held that the lodestar figure "normally provides a 'reasonable' attorney's fee within the meaning of the statute." 104 S.Ct. at 1548 (citing *Hensley v. Eckerhart, supra*, 103 S.Ct. at 1940). The Court observed that any "upward adjustment to the presumptively reasonable fee of rate times hours is appropriate" only in "the rare case." *Id.* at 1550 n. 18. The Court, however, noted that it had "no occasion in this case to consider whether the risk of not being the prevailing party ...

may ever justify an upward fee adjustment." *Id.* at n. 17.

■ The Court of Appeals considered the *Blum* case five months later in *Murray v. Weinberger*. In *Murray*, the Court emphasized that *Blum* did not expressly approve the contingency adjustment doctrine, and that, in any event, "an upward adjustment to compensate for the risk of losing ... is permissible only in an *exceptional case.*" at 1432 (emphasis supplied). The Court described the "minimum requirements that must be met" to obtain the adjustment:

"The upward adjustment is not proper when: (1) the lodestar itself comprehends an allowance for. the contingent nature of fee payment; or (2) the fee applicant bore little or no risk of nonpayment because of a fee arrangement with the client; or (3) the case is not exceptional within the meaning of *Blum v. Stenson.*" *Id.* at 1431.

Plaintiffs' request here for an adjustment must be evaluated under these new standards. The first and second prongs of the *Murray* "minimum requirements" test are considered in the margin.[6] More diffi-

---

**6.** Quite frankly, the Court has some difficulty in understanding the *Murray* Court's explication of the first "minimum requirement": an adjustment is "not proper when (1) the lodestar itself comprehends an allowance for the contingent nature of fee payment." *Id.* at 1431. In *Concerned Veterans*, the Court observed that the hourly rate could "reflect the possibility that the suit would not succeed and no fee would be obtained," and urged applicants to "present the proposed lodestar billing rate exclusive of any risk premium." 675 F.2d at 1328. The "contingent nature of fee payment," of course, is due to the requirement that only prevailing parties are entitled to a fee award. The contingency is the possibility of an adverse ruling by the court. In a setting where the proposed rate already takes that possibility into account, an adjustment is obviously unwarranted.

The *Murray* Court puts a somewhat different spin on the inquiry:

"All lawsuits have a risk of nonpayment attached to them. As we noted in *Copeland v. Marshall*, every attorney faces a risk of not getting paid for some of the work expended on behalf of a client, because, for a variety of reasons, not all hours worked are billed and recouped by an attorney. The hourly rates

which attorneys charge reflect the fact that a certain number of hours rendered will not generate any legal fees. The market-based hourly rate which is incorporated into the lodestar figure therefore includes an increment for the normal risk of not being paid for some of the hours that an attorney expends. Thus, an enhancement of the lodestar figure for the risk of nonpayment is not proper if the risk of nonpayment in the particular case is the same as it is in the average case in the relevant market." At 1431–1432 (footnotes omitted).

In *Murray*, "risk" no longer means the possibility of losing the suit. "Risk" essentially means "billing judgment," a matter that seemingly has little to do with the traditional understanding of the contingency doctrine. The *Murray* Court does acknowledge the "possibility of loss" formulation in its third "minimum requirement," but the salient point is that an already "inherently imprecise" determination, *Copeland III, supra*, 641 F.2d at 893, now has an added gloss that is somewhat remote from its theoretical foundation. In addition, the *Murray* Court offers no guidance on how to go about applying its new risk of nonpayment rule. The rule appears to require the district court to

culty comes in applying the third test: a risk of loss adjustment is proper only if the case is "exceptional within the meaning of *Blum v. Stenson.*" *Id.* at 1431. Despite citing a "pressing need for simple rules in attorney's fees cases," *id.* at 1433, the Court unfortunately failed to describe any circumstances that may be deemed to be "exceptional within the meaning of *Blum.*" This omission is particularly troublesome, because, as noted, *Blum* itself did not involve an express request for a risk of loss adjustment. Moreover, *Blum* did not define "exceptional." The Court included the degree of success achieved as one mark of the exceptional, but did not limit the relevant factors solely to the "results obtained." 104 S.Ct. at 1550 (citing *Hensley, supra,* 103 S.Ct. at 1940). The *Murray* Court does suggest that an "exceptional" case is "one of those rare cases in which [an adjustment] is necessary to facilitate the filing of meritorious claims," but does not describe the sort of setting where the desired behaviorial incentives may be found. In short, the simplicity of these standards is difficult to discern.

Perhaps the best course is to review current contingency law against the backdrop of the *Blum* opinion, and determine whether *Blum* rules out reliance on any previously relevant factor. In *Laffey,* Chief Judge Robinson outlined the test:

> examine the billing judgment exercised by the applicant, determine whether it generally matches community practice (*i.e.,* the "average case in the relevant market"), and deny any adjustment if the applicant's "billing judgment increment" is excessive. (Needless to say, an adjustment is improper under the *Copeland III/Concerned Veterans* formulation of the first minimum requirement if the proposed rate includes an allowance for the possibility of loss on the merits.) The Court is already required to examine the applicant's billing judgment in calculating the lodestar, and as noted *supra* note 1, Terris & Sunderland's practice is not extraordinary or unusual in any way. The Court therefore concludes that plaintiffs' application satisfies both traditional and *Murray* standards; the proposed hourly rate does not include an allowance for risk of loss, and it does not include an excessive allowance for "non-billable" work.

> "In order to assess the risk that Plaintiffs' counsel accepted at the outset of this litigation, the Court must consider not only the probability of success but what was being risked. The former category requires an evaluation of (1) the legal and factual complexity of the case; (2) the probability of defendant's liability, including whether it has been suggested by previous proceedings and whether it is asserted under existing case law or is advanced as a novel theory; and (3) the difficulty or ease with which damages (if any) could be proven. The latter category includes the number of hours and the amount of out-of-pocket expenses risked without guarantee of compensation." 572 F.Supp. at 378 (citation and footnote omitted).

The *Laffey* approach defines "risk at the outset" as a function of the merits and the mechanics of the litigation, with the complexity of the case obviously affecting both elements. In *Blum,* however, the Supreme Court found that "neither complexity nor novelty of the issues ... is an appropriate factor in determining whether to increase the basic fee," because those factors "presumably were fully reflected in the number of billable hours recorded by counsel." 104 S.Ct. at 1548–49.

A close reading of *Blum* suggests that *Laffey's* contingency analysis, incorporating consideration of complexity and unset-

> With respect to the second minimum requirement, the retainer agreement with Ms. Palmer assured plaintiffs' counsel of some "remuneration." (*see supra* note 2). The percentage adjustment proposed by counsel takes this "partial contingency" into account: "[the contingency portion] was calculated by determining the ratio of the average hourly rate for merits issues paid by plaintiffs ($28.51) and the average hourly rate for merits issues requested in this application ($102.45) ... This ratio (0.72) represents the percentage of the case which was contingent. This percentage was then multiplied by 33%. The resulting 24% rate is the effective contingency rate for all plaintiffs' work on merits issues for the applicant class." Plts.Mem. at 31–40. (Derivation of the 33% percentage is explained *id.* at 37–39. *See also* Plts.Reply at 22). This approach adequately captures the degree to which the risk of nonpayment was reduced by the fee arrangement.

tled law, remains good law. First, the Supreme Court only ruled out complexity in and of itself as a basis for an upward adjustment. *See id.* at 1548. The Court did not reach the general question of contingency adjustments, much less the narrower matter of calculating one. Second, the Court emphasized the thin record before it. The applicant in *Blum* apparently made no novelty or complexity argument. There was nothing in the affidavits or briefs "identify[ing] any risks associated with the litigation." "*On this record,*" the Court concluded, "any upward adjustment for the contingent nature of the litigation was unjustified." *Id.* at 1550 (emphasis supplied). The Court did not foreshadow the result in a case like this one, with a carefully assembled and documented request.

Third and more generally, the *Laffey* approach is consistent with at least one broader theme of the *Blum* opinion: equal treatment of private and public-interest attorneys. A complex or novel matter obviously requires more work. As the *Blum* Court made clear, the realities of document searches and sophisticated legal analysis are fully addressed by the lodestar formula: hours billed multiplied by a rate reflecting the demands upon, and the abilities of, the prevailing party's attorney.

As the Court noted, however, "the product of reasonable hours times a reasonable rate does not end the inquiry." *Id.* at 1548 n. 14 (quoting *Hensley, supra,* 103 S.Ct. at 1940). Complexity and novelty present problems going beyond late nights at the office. Unsettled law "magnifies the risk" of an unsuccessful suit because it increases the likelihood of appeal and changes in controlling law. Complicated and wide-ranging claims raise the possibility of a smoking gun in the files pointing directly at plaintiff, and the certainty of counsel's "substantial investment (both in time and out-of-pocket expenditures) over an extended period." *Laffey, supra,* 572 F.Supp. at 378–79 & n. 48. It bears repeating that risk is assessed at the outset, where both controlling law and conclusive fact are but subjects of prediction.

■ It also bears note that while private attorneys are compensated whether their predictions are accurate or not, public-interest or reduced-rate lawyers have no such security. The value to the private attorney of her fees comes not only from the dollar amount but also the near certainty of payment (barring the client's bankruptcy or similar financial disaster). The "risk premium" of *Concerned Veterans* simply serves as a proxy for the security element inherent in the private attorney's fee. In a legal regime where distinctions between private and public-interest firms are irrelevant, *see Blum, supra,* 104 S.Ct. at 1547, and where the objective is to fashion a fee award closely modeled on "prevailing market standards," then the award must reflect both the effort of the attorney and the certainty or uncertainty of ever receiving compensation for it. That is the purpose of the contingency adjustment, and the Court believes that the *Laffey* method of achieving it remains valid after *Blum.*

■ Plaintiffs adequately identify the "specific circumstances" supporting an adjustment in this case. *See* Plts.Mem. at 31–35. Both legal and factual complexity and uncertainty existed at the commencement of this suit. For example, on the critical issue of employment test validation, there was no legally preferred method of validation (*see Washington v. Davis,* 426 U.S. 229, 247 n. 13, 96 S.Ct. 2040, 2051 n. 13, 48 L.Ed.2d 597 (1976)), and plaintiffs had no knowledge of whether defendant in fact employed validation procedures. That remained to be uncovered through discovery. Furthermore, plaintiffs' counsel were obviously committing significant time and resources, particularly in view of the firm's small size. Class actions involve efforts beyond those associated with an ordinary lawsuit, and the massive statistical evidence required expert (and expensive) analysis. *See* First Terris Affidavit at ¶¶ 29, 38. It appears to the Court that a contingency adjustment is "necessary to facilitate the filing" of cases of this type,

where both the scope of the claims and the number of complainants are atypical.

At the same time, however, plaintiffs' lead counsel believed that the class had a strong case; he put the odds of success at 75%. *See id.* at ¶ 54; Terris Depo. at 41. The Court shares that belief, perhaps even more strongly. Upon consideration, the Court believes that the merits lodestar should be adjusted upward by 20% to fairly compensate plaintiffs' counsel for its efforts in taking on and successfully completing this portion of the litigation. The adjustment produces a final merits award of $337,669.20.

### 3. *Litigation Expenses*

■■■■ The final issue concerns defendant's objection to $2,528.97 of the $35,880.99 sought by plaintiffs as reimbursement for "reasonable litigation expenses." Defendant claims that expenditures on postage, long distance telephone calls, photocopying, and others are part of overhead and thus not compensable. *See* Def.Mem. at 9. The test for compensability turns on whether the claimed expenses are routinely billed to clients, reasonable in amount, and adequately documented. *See Laffey, supra,* 572 F.Supp. at 382–83; *Plannells v. Howard University, supra,* 34 FEP Cases at 71. Plaintiffs' supporting materials and discovery taken by defendant demonstrate that the challenged expenses were and are customarily billed to clients, and given the scale of this action, were reasonable in amount. Consequently, the expenses claimed by plaintiffs should be awarded in full, for a total of $37,971.03.

### 4. *Conclusion*

Courts do not like attorney's fee litigation, and at every opportunity encourage parties to reach settlement. *See, e.g., Blum, supra,* 104 S.Ct. at 1550 n. 19; *Concerned Veterans, supra,* 675 F.2d at 1330–31. The Court of Appeals in *Copeland III* and in *Concerned Veterans* set out specific substantive and procedural standards in part to encourage settlement of fee requests. In particular, the *Concerned Vet-* *erans* case requires the government defendant to assemble a "precise," "limited," "well-founded" challenge to the request, supported by "equally specific countervailing evidence." *Id.* at 1338 (Tamm, J., concurring), 1326. Blunderbusses do not carry burdens.

In this case plaintiffs filed a comprehensive, reasonable and thoroughly documented fee request. Plaintiffs attached all the required baggage. There are affidavits, resumes, and time slips. It was an eminently professional effort, fully in accord with the letter and spirit of *Copeland III* and *Concerned Veterans.*

The government, on the other hand, submitted a nine-page memorandum of law that practically ignores the law, and three lists apparently offered as "equally specific countervailing evidence." This Court has its doubts about the fee calculation standards that have evolved, but it has no doubt that all involved must play by the rules set down by the Supreme Court and the Court of Appeals. Should the government decide that the costs of playing by the rules exceed the difference in settlement positions, it should settle, rather than submit a sadly deficient (but inexpensive) "opposition" to the Court. The government should always remember that judges as well as fee awards are paid from the public treasury.

In sum, the Court concludes that plaintiffs' proposed lodestar figure, adjusted upward by 20%, represents a fully-compensatory fee. The Court is not penalizing defendant for less-than-artful advocacy; the award is based on review of the record and on a reasonable, documented application.

Accordingly, plaintiffs' request for an award of attorney's fees and expenses under 42 U.S.C. 2000e–5(k) is granted in the amount of $439,541.48.