Alison PALMER, et al., Plaintiffs,

v.

George P. SHULTZ, Defendant.

Marguerite COOPER, et al., Plaintiffs,

v.

George P. SHULTZ, Defendant.

Civ. A. Nos. 77–2006, 76–1439.

United States District Court,
District of Columbia.

Feb. 26, 1988.

Bruce Terris, Ellen K. Wayne, Terris, Edgecombe, Hecker & Wayne, Washington, D.C., for plaintiffs.

John C. Martin, Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM OPINION

JOHN LEWIS SMITH, Jr., District Judge.

This case returns to the Court for a recalculation of attorneys' fees and expenses under § 706(k) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(k), pursuant to the guidelines set forth in several significant controlling decisions rendered by the Supreme Court and Court of Appeals for the District of Columbia Circuit subsequent to this Court's previous ruling in this matter in *Palmer v. Shultz*, 598 F.Supp. 382 (D.D.C.1984). The specific issues before the Court concern: 1) the appropriate hourly rate to be used in calculating the lodestar to be awarded plaintiffs; 2) the appropriateness of an enhancement of the lodestar for quality of representation; and 3) the appropriateness of an enhancement of the lodestar to compensate plaintiffs for the risk of nonpayment.

A. *Determining the Appropriate Hourly Rate to be Used in Calculating the Lodestar*

In its initial ruling in this case, the Court determined that the appropriate hourly rate to be used in calculating the lodestar was the prevailing hourly market rate in the community for similar services, as opposed to the plaintiffs' actual hourly rates. *Palmer v. Shultz*, 594 F.Supp. 433, 436–438 (D.D.C.1984). Shortly following the entry of the Court's initial order however, the Court of Appeals rendered *Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4 (D.C.Cir. 1984) (*"Laffey"*), which substantially modified the methodology to be used in calculating attorney fee awards in this circuit, particularly in respect to the use of prevailing market rates in computing the lodestar.

The Court of Appeals noted that although reference to prevailing market rates is necessary as a proxy in cases involving non-profit law firms that have no established billing rates, *see, e.g., Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), there is ordinarily no such similar need where the prevailing attorneys operate a "for-profit" law firm with readily ascertainable customary hourly rates. *Laffey*, 746 F.2d at 15–18. Where the fee applicants have such billing histories however, " '[t]he best evidence of the value of their time is the hourly rate which they most commonly charge their fee paying clients for similar legal services.' " *Id.* at 18 (citation deleted). "By setting the fee award of the attorney's customary billing rate, the opportunity cost of foregone representations is precisely offset by a fee award in the same amount." *Id.*

In adherence to the new guidelines set forth in *Laffey*, this Court reconsidered its earlier order awarding plaintiffs a lodestar fee based on prevailing market rates, and concluded that because plaintiffs had an established hourly billing rate, that rate was the appropriate rate to be used in calculating the lodestar. 598 F.Supp. 382, 384–85 (D.D.C.1984). The Court's modified ruling was initially affirmed by the Court of Appeals, but was later vacated and remanded for reconsideration with the clarification that although the customary hourly rates charged by a firm should ordinarily be presumed to be the reasonable rates for the purpose of calculating the lodestar, *Laffey* acknowledges the possibility of a fee applicant overcoming those presumptively reasonable rates upon a showing that

they are "abnormally low." *Palmer v. Shultz*, C.A. Nos. 84–5815, 84–5816, August 25, 1986, Mem.Op., pp. 2–3 [798 F.2d 508 (table) ]. "The fee applicant bears the burden of establishing that the particular firm's historic rates are below the broad range prevailing in the community during the same time for similar work." *Id.* Citing *Laffey*, 746 F.2d at 19, 25. "Only if the firm's rates fall below the community's rate brackets for the services in question will an upward adjustment be in order." *Id.* More recently, in *Save Our Cumberland Mountains, Inc. v. Hodel*, 826 F.2d 43, 49 n. 3 (D.C.Cir.1987), *reh'g en banc granted*, 830 F.2d 1182 (D.C.Cir.1987) (*"Cumberland Mountains"*), the Court of Appeals restated the proposition that while counsels' customary hourly rate is the presumptively reasonable rate to be used by the court in calculating the lodestar, the court should disregard " 'abnormally high or low rates' charged by counsel in comparison with the market's range of rates". (Citing *Laffey*, 746 F.2d at 20 & n. 100).

In an effort to rebut the presumptive reasonableness of their own customary historic hourly rates, plaintiffs have submitted affidavits from members of over twenty Washington, D.C. law firms documenting the historic rates these attorneys charged for representation in cases involving complex federal litigation. Pursuant to *Laffey*, plaintiffs have then bracketed those rates in a comparison chart which demonstrates the differences between their own hourly rates and those charged by the other attorneys. In nearly every instance of comparison, plaintiffs' rates fell substantially below the lowest rates charged in the community for similar services throughout the period in question. *See* Attachment A. In at least one instance, the hourly rate charged by one senior member of plaintiffs' firm was three times lower than the lowest hourly rate charged by his contemporaries. *Id.* at A–1. Plaintiffs accordingly argue that because their rates are below

the lowest rates charged in the community for representation in complex federal litigation, they are entitled to an upward adjustment.

In response, defendant contends that plaintiffs have failed to meet their burden of presenting the Court with sufficient evidence of the broad range of prevailing rates in the Washington D.C. community. More particularly, defendant complains that plaintiffs have presented the Court with an uneven distribution of rate data obtained from large "premium" law firms. The Court however finds that plaintiffs' data presents a roughly even distribution of rate information from the Washington community's small, medium and large firms.[1] Even assuming *arguendo* that *Laffey* precludes examination of rates charged by firms of varying sizes, plaintiffs' evidence amply demonstrates that rates charged by large firms for representation in cases involving complex federal litigation are not significantly different from those charged by small firms for similar services.

■ Moreover, the focal point of inquiry in ascertaining relevant comparable community hourly rates concerns itself with the particular fee applicant's degree of skill in handling a particular level of litigation, as opposed to the size of the fee applicant's firm. *See Palmer, supra,* 594 F.Supp. 433 at 436. As the Court of Appeals noted in *Laffey, supra,* 746 F.2d 4, 24–25, in order to demonstrate a relevant comparison between the fee applicant's rates and community rates: " '[T]he burden is on the fee applicant to produce satisfactory evidence . . . that the requested rates are in line with those prevailing in the community *for similar services by lawyers of reasonably comparable skill, experience and reputation.'* " *Id.* (citation deleted) (emphasis added). *Accord National Association of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319, 1325 (D.C.Cir.1982)

---

1. Plaintiffs' data is derived from rate information received from 10 firms employing from 3–22 attorneys, 5 firms employing from 24–75 attorneys and 9 firms employing from 105–278 attorneys. While one medium sized firm eventually merged with a large firm and the membership of other firms progressively expanded, the distribution remained essentially the same throughout the period in question.

("*Concerned Veterans*") ("[T]he hourly rate should generally depend on the experience of the attorney and the type of work involved".).

While defendant has devoted a great deal of critical argument attacking the methodology plaintiffs employed in obtaining their rate bracket information, he has provided little persuasive evidence of his own tending to controvert the accuracy or the relevancy of plaintiffs' community rate data. The Court of Appeals has clarified in this regard that the government must submit specific rebuttal evidence in order to successfully defeat a fee applicant's requested rate as follows:

> Once the fee applicant has provided support for the requested rate, the burden falls on the Government to go forward with evidence that the rate is erroneous. And when the Government attempts to rebut the case for a requested rate, it must do so by specific countervailing evidence.... [I]n the normal case the Government must either accede to the applicant's requested rate or provide specific contrary evidence to show that a lower rate would be appropriate.

*Concerned Veterans, supra,* 675 F.2d 1319, 1326.

The only arguably significant rebuttal evidence submitted by defendant in this case was obtained from the District of Columbia Bar Lawyer Referral and Information Service ("LRIS"). However, as plaintiffs have previously documented, the LRIS data submitted by defendant fails to accurately reflect relevant rates charged by community attorneys engaged in complex federal litigation. *See* Pltfs' Reply, July 12, 1984, Attachment B. Indeed, questionnaires sent to attorneys participating in LRIS reveal that many of them had little, if any, experience in Title VII class action litigation. *Id.* Others responded that the rates listed in LRIS were lower than their standard rates either because they were fulfilling their ethical obligations to provide counsel to clients who could not afford normal rates or because they had recently begun their own practices and needed new clients, even at reduced rates. *Id.* Most

importantly however, when asked whether the LRIS rates were indicative of the rates counsel would charge for representation in federal class action employment discrimination litigation, a majority stated that because of the extraordinarily demanding nature of such cases, they would require a higher hourly rate than they had quoted in LRIS. *Id.*

As the Court has already noted, this case was "no ordinary lawsuit." 594 F.Supp. 433, 437. On the contrary, it was a complicated class action suit involving across-the-board challenges to a particularly obscure personnel system. *Id.* The substantive law was in flux and the litigation raised questions of extraordinary factual, statistical and legal complexity. *Id.* Additionally, if not most importantly, a great majority of the individual attorneys in plaintiffs' firm possess exceptional skill and experience in Title VII litigation. *Laffey* is quite specific in its direction that relevant comparisons of prevailing market rates must be made between the rates charged by the applicant firm, and "the rates charged by other firms for similar work in the same community." *Id.,* 746 F.2d 4 at 24–25. Such comparisons must necessarily be limited in reference to community attorneys with "reasonably comparable skill, experience and reputation." *Id.* In light of this standard, defendant's LRIS evidence loses much of its relevance in this matter since it fails to accurately reflect community rates for representation by similarly experienced attorneys engaged in similarly complex federal litigation. Stated more particularly, defendant has simply failed to provide "equally specific countervailing evidence" tending to show that plaintiffs community rate bracket data is erroneous. *Concerned Veterans, supra,* 675 F.2d 1319 at 1326.

The only remaining question presented therefore is whether plaintiffs have met their burden of showing that their "historic rates are below the broad range prevailing in the community during the same time period for similar work." *Palmer, supra,* C.A. Nos. 84–5815, 84–5816, August 25, 1986, Mem.Op., p. 3 [798 F.2d 508 (table)]. The Court finds that

they have. The clearest example of the disparity between plaintiffs' rates and community rates is evidenced in the case of Bruce Terris, a senior member of plaintiffs' firm with well over twenty years of experience in the practice of law. While Mr. Terris charged $35 per hour for his services in 1976 and $40 per hour in 1977, his contemporaries were charging their clients between $90–150. *See* Attachment A, A–1. This disparity continued throughout the period in question, with Mr. Terris charging $60 per hour in 1982 while similarly experienced attorneys were charging between $135–250 for representation in similarly complex federal class action litigation. *Id.* In view of the foregoing, the Court finds that Mr. Terris' rates fell "below the broad range prevailing in the community during the same time period for similar work." *Palmer, supra,* C.A. Nos. 84–5815, 84–5816, August 25, 1986, Mem.Op., p. 3 [798 F.2d 508 (table)]. The Court further finds that plaintiffs have rebutted the presumptively reasonable rates of the other fee applicants in this matter, having shown that, with few exceptions, the rates of these attorneys also fell below the broad range of community rates throughout the period in question. *See* Attachment A.

### Computation of an Appropriate Upward Adjustment

The opinion of the Court of Appeals in this matter directs that an "upward adjustment [would] be in order" upon plaintiffs' showing that their rates fell "below the community's rate brackets for the services in question." C.A. Nos. 84–5815, 84–5816, Mem.Op., p. 3 [798 F.2d 508 (table)]. Plaintiffs have requested, without explanation, an hourly rate which appears in many instances to be a roughly composite average rate of all the firms represented in their data. The Court must differ with plaintiffs' methodology in this respect.

■ Although plaintiffs have successfully rebutted the presumptive reasonableness of their own hourly rates, the Court concludes they are only entitled to an upward adjustment of their below-market rates to a level commensurate with the minimum market rate at which equally competent counsel would have taken on similar litigation during the period in question. As the Court of Appeals recently noted in *Cumberland Mountains, supra,* "So long as a statutory fee award is sufficient to satisfy the monetary goal of like attorneys who would take on like cases absent a fee statute, the purpose of the fee statute is satisfied." *Id.,* 826 F.2d 43 at 49. In view of the foregoing, it seems clear that for the purpose of fulfilling the goals of the attorney's fee statute, plaintiffs in the case at bar are only entitled to an upward adjustment equivalent to the bottom bracket of the range of rates listed in their community rate data, those rates evidencing the otherwise reasonable rate at which "like attorneys ... would take on like cases...." *Id.* Such an adjustment brings plaintiffs' below-market rates within the range of reasonable community rates without producing a windfall "in excess of the rate at which qualified counsel would be willing to represent civil rights claimants who have legitimate grievances." *Laffey, supra,* 746 F.2d 4, 16. *See also Blum, supra,* 465 U.S. 886, 897, 104 S.Ct. 1541, 1548, 79 L.Ed. 2d 891 (1984) (quoting S.Rep. No. 94–10011, p. 6 (1976)).

### B. *Appropriateness of an Upward Adjustment for Quality of Representation*

In its previous opinion in this case, the Court awarded plaintiffs a 54.75 percent enhancement for "superior services and exceptional success." 598 F.Supp. 382, 385 (D.D.C.1984). Shortly following the Court's ruling in this regard however, the Supreme Court rendered *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) (*"Delaware Valley I"*), in which it emphasized that "[b]ecause considerations concerning the quality of a prevailing party's counsel's representation normally are reflected in the reasonable hourly rate, the overall quality of performance ordinarily should not be used to adjust the lodestar, thus removing any danger of 'double counting.'" *Id.* 106 S.Ct. at 3099. In the absence of "detailed findings as to

why the lodestar amount was unreasonable, and in particular, as to why the quality of representation was not reflected in the [lodestar]," the Court found "no reason to increase the fee award ... for the quality of representation." *Id.* at 3100.

■ In recognition of *Delaware Valley I*'s demanding standard for awarding enhancements based on quality of representation, plaintiffs have only requested such an enhancement in the event the Court uses their historic billing rates in calculating the lodestar. In this regard, plaintiffs contend that were they to receive compensation based upon their own below-market rates, the lodestar would reflect neither the special skill and experience of counsel nor the quality of representation in this case. *See Delaware Valley I, supra,* 106 S.Ct. at 3098. Plaintiffs thus claim that the quality of their representation can only be adequately compensated through an upward adjustment of their below-market hourly rates to market rate levels.

In view of plaintiffs' concession in this respect, the Court concludes that its adjustment of plaintiffs' historic rates to a level commensurate with prevailing community market rates adequately compensates them for the quality of their representation in this case. Accordingly, plaintiffs' request for an enhancement of the lodestar for superior quality of representation will be denied.

C. *Appropriateness of an Enhancement to Compensate for Risk of Nonpayment*

In addition to its previous award of a 54.75 percent enhancement of the lodestar for quality of representation, the Court awarded plaintiffs a 20 percent enhancement for the risk of not prevailing in this litigation. 594 F.Supp. 433, 438–442. The criteria formerly used by the Court in concluding that a risk of loss enhancement was appropriate however, must now be reconsidered in light of the guidelines set forth in the Supreme Court's recent plurality opinion addressing this issue in *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* — U.S. ——, 107 S.Ct.

3078, 97 L.Ed.2d 585 (1987) (*"Delaware Valley II"*).

### Mitigation of Risk of Nonpayment through Partially Contingent Fee Agreements

In *Delaware Valley II,* Justice O'Connor concurred with the plurality's essential proposition that unless an attorney, who is otherwise eligible for an award of attorneys's fees under a fee shifting statute, has an agreement with the client that the attorney will be paid, win or lose, the attorney assumes the risk of being paid nothing at all should the case be lost. *Id.* 107 S.Ct. at 3082 (O'Connor, J., concurring in part and concurring in judgment). "[W]hen the plaintiff has agreed to pay its attorney, win or lose" however, "the attorney has not assumed the risk of nonpayment and there is no occasion to adjust the lodestar fee because the case was a risky one." *Id.*

In the case at bar, plaintiff Alison Palmer and the attorney fee claimants entered into various formal retainer agreements obligating Ms. Palmer to pay attorney's fees on an ongoing basis at an average hourly rate of $28.51. This rate was approximately 53 percent of plaintiffs' average historical billing rate of $53.57. As such, plaintiffs' risk of recovering no attorney's fees in this case was significantly mitigated by Ms. Palmer's obligation to pay them an hourly rate of $28.51 irrespective of the outcome of the litigation. *See Delaware Valley II, supra,* 107 S.Ct. 3078, 3099 (Blackmun, J., dissenting).

Plaintiffs acknowledge that their risk of recovering no fees in this case was substantially mitigated by Ms. Palmer's obligation to pay them half their customary fee, win or lose; however, they contend that they are entitled to a contingency enhancement to compensate them for the risk of not recovering the balance of their customary fee in the event the case were ultimately lost. In this regard, plaintiffs submit that the market regularly compensates quasi-contingent fee cases at a higher rate than non-contingent cases. *See* discussion regarding market treatment of con-

tingency cases, *infra*. In response, defendant argues that the partially contingent fee agreement between plaintiffs and Ms. Palmer adequately insulated plaintiffs from the risk of loss inherent in a fully contingent case, and maintains that plaintiffs must demonstrate why the recovery of partial fees did not provide adequate compensation for the risk they undertook.

The Court rejects defendant's arguments in this regard and concludes that plaintiffs are entitled to present their claim for a contingency enhancement since a substantial portion of their customary hourly rates was subject to nonrecovery in the event they did not prevail in this litigation. However, because plaintiffs were able to mitigate the risk of nonrecovery through their quasi-contingent agreement with Ms. Palmer, the Court concludes that, assuming contingency enhancement is otherwise appropriate in this matter, plaintiffs would only be entitled to the market's lowest prevailing contingency enhancement rate for quasi-contingent cases. *See* discussion *infra*.

### Availability of Contingency Enhancement to Portion of Fees Subject to Risk of Loss

■ Pursuant to the guidelines set forth in *Delaware Valley II, supra*, a contingency enhancement may only be awarded upon a fee applicant's showing that 1) the rates of compensation in the private market for contingent fee cases as a class differ from those where counsel is paid, win or lose, on a regular basis; and 2) without an adjustment for risk the prevailing party would have faced "substantial difficulties in finding counsel." *Id.* 107 S.Ct. 3078, 3089–91 (O'Connor, J., concurring in part). In order to demonstrate that the local private market treats contingent fee cases as a class differently than non-contingency cases, plaintiffs have shown that attorneys in the Washington D.C. community will only accept a fully contingent case if their recovery will be at least double their normal hourly billing rate and will only accept a partially contingent case if their recovery is enhanced by at least 50 percent. The following affidavit is illustrative of the general sentiment of attorneys who handle contingency cases:

> In my assessment as to whether to accept a contingency fee case on behalf of a would-be plaintiff (where there is a reasonable doubt as to the outcome), I make an economic judgment as to whether I can reasonably anticipate that the case will produce three times the normal hourly rates of the attorneys in my firm who will be working on the case. Otherwise the economics of the case do not justify our firm becoming involved with it. Certainly, if I project that even if successful my firm can only recover a fee which equals the fee computed at normal hourly rates, then the case does not justify the effort on our firm's part.

Decl. Clifford, Pltfs' Ex. H. *See also* Pltfs' Exhbts. T; X; AA.

In view of plaintiffs' thorough documentation of the degree to which the market compensates for contingency, the Court finds that plaintiffs have clearly established that attorneys in the Washington D.C. community will ordinarily not take cases on a contingency basis without an upward adjustment of their normal hourly rate of at least 100 percent. The Court further finds that plaintiffs' documentation of the market's treatment of partially contingent cases supports the conclusion that attorneys will not undertake a case in which they are insured recovery of only a portion of their fees absent an upward adjustment of at least fifty percent. As such, plaintiffs have fully substantiated their claim that the market regularly compensates partially contingent cases at a higher rate than non-contingent cases.

In addition to the requirement that a fee applicant demonstrate how the relevant market treats contingency cases as a class, Justice O'Connor concluded:

> I would also hold that a court may not enhance a fee award any more than necessary to bring the fee within the range that would attract competent counsel. I agree with the plurality that no enhancement for risk is appropriate unless the applicant can establish that without an adjustment for risk the prevailing party

"would have faced substantial difficulties in finding counsel in the local or other relevant market."

*Id.* 107 S.Ct. at 3091.

In establishing this element of *Delaware Valley II's* guidelines for awarding contingency enhancements, plaintiffs have demonstrated that competent Washington, D.C. Title VII attorneys will not undertake such cases on a contingency basis without the economic incentive of receiving a higher fee to compensate them for the risk of nonpayment. For example, one local Title VII practitioner responded:

> Contingent compensation ... awarded at the end of 16 years of litigation without any enhancement for ultimate risk of nonpayment is not an adequate or reasonable attorney's fee sufficient to justify undertaking such cases. Our firm would not accept another contingent Title VII class action if there was no possibility of obtaining an enhancement to compensate for the risk of nonpayment, even if we were compensated at current rather than historic hourly rates.

Decl. McDonald, Pltfs' Ex. O. *See also* Pltfs' Exhbts. I; M; N; BB; VV–rr.

Defendant has not attempted to refute plaintiffs' evidence in this regard by producing specific countervailing evidence showing that there are indeed attorneys in the relevant market who are willing to undertake Title VII cases on a purely contingent basis, *see Concerned Veterans, supra,* 675 F.2d 1319, 1325, but has instead argued that plaintiffs' affidavits fail to demonstrate any "shortfall" in the number of attorneys who are willing to be compensated at their normal rates for representation in Title VII litigation. More particularly, defendant alleges that while numerous affidavits submitted by plaintiffs contain conclusions to the effect that it would be significantly more difficult to locate counsel willing to handle contingent Title VII class actions if the prevailing parties had no prospect of obtaining enhancement for the risk of nonpayment, none of the affidavits contain any facts indicating that attorneys in the Washington, D.C. community will not take a Title VII case on a straight contingency basis. (citing Pltfs' Ex. J, Decl. Boggs; Pltf's Ex. K, Decl. Lenhoff; Deft's. Ex. 6, Dep. Boggs, pp. 94–102). The Court disagrees with defendant's analysis of plaintiffs' evidence.

Plaintiffs' evidence shows that based on the legislative history of the fee-shifting statutes, Title VII attorneys have taken on contingent discrimination cases in the past with the anticipation of receiving fees commensurate with market rate levels for similarly complex federal litigation, including adequate compensation for the risk of nonpayment. Pltfs' Ex. J, Decl. Boggs, ¶ 4. The prospect of receiving compensation for the risk of nonpayment has accordingly made it easier for civil rights organizations to locate counsel willing to represent meritorious claimants on a contingent fee basis. *Id. See also* Pltfs' Ex. DD, Decl. Chambers, ¶ 6. Notwithstanding the availability of such enhancements, it has become significantly more difficult to locate competent counsel willing to devote the time and resources necessary to conduct Title VII litigation. Pltfs' Ex. DD, Dep. Chambers, p. 11; Ex. J, Decl. Boggs, ¶ 5. It is clear therefore that the unavailability of contingency enhancements, combined with the demanding and protracted nature of Title VII class action litigation, would make it economically unfeasible for a great majority of attorneys to undertake such cases on a purely contingent basis. *Id.* at ¶ 5, Pltfs' Ex. K, Affdvt. Lenhoff, ¶ 6; Ex. DD, Decl. Chambers, ¶ 4.

In sum, it appears that defendant's arguments attacking the sufficiency of plaintiffs' evidence misconceive the *Delaware Valley II* inquiry which focuses itself specifically on the question of whether, absent a contingency enhancement, plaintiffs would have faced substantial difficulty in obtaining counsel in the relevant market on a purely contingent basis at counsels' normal hourly rate. As the Court has previously concluded, plaintiffs have provided thorough and convincing evidence showing that there would indeed be a serious shortage of attorneys willing to handle Title VII class actions on a contingency basis absent the incentive of recovering an enhancement to compensate for the risk of nonpayment.

The Court accordingly concludes that plaintiffs have sufficiently demonstrated that Ms. Palmer would have encountered substantial difficulties in obtaining counsel to undertake this litigation who did not expect to be compensated with an award large enough to make the case worthwhile despite the risk of loss.

This is so notwithstanding the fact that in the case at bar, Ms. Palmer encountered no particular difficulties in retaining the services of plaintiffs' firm on a quasi-contingent basis. In this regard, there is no disagreement between the parties that the primary reason why Ms. Palmer faced no substantial difficulties in locating counsel to represent her in this matter was the fact that plaintiffs had previously successfully represented her in an individual claim of sex discrimination against the State Department. *See Palmer v. Rogers,* 10 EPD ¶ 10,265 (1975) [Available on WESTLAW, 1975 WL 193]. However, the fact that Ms. Palmer had no particular difficulty in obtaining counsel here because of an ongoing attorney-client relationship with plaintiffs' firm, is not conclusive of the question of whether she would have otherwise faced "substantial difficulties" in locating counsel in the relevant market who would have been willing to take the case on a contingency basis absent an enhancement for the risk of nonpayment.

Moreover, fee applicant Bruce Terris states that when the firm first undertook this case, it was anticipated that "if successful [the firm] would be paid at market rates for attorneys of similar experience and ability and would receive an enhancement for the risk of nonpayment as allowed by law." Pltfs' Ex. A., Para. 2. Plaintiffs' expectation of such an enhancement was based in part on this Court's observation in *Palmer v. Rogers,* 10 EPD ¶ 10,499 (1975) that since "[t]he purpose of the fee award is to ensure that plaintiffs suffering discrimination can obtain counsel, the fees awarded should be large enough to make the case desirable despite the risk of loss." *Id. See also Evans v. Sheraton Park Hotel,* 503 F.2d 177, 187 (D.C.Cir.1974) (Noting that whether fee is fixed or contingent is appropriate factor to consider in awarding reasonable attorney fee in Title VII cases) (Cited in *Palmer v. Rogers, supra* ).

Mr. Terris further stated that the expectation of being compensated for the risk of loss was crucial to his decision to take the case, and that he would not have taken the case if he knew he could not obtain fees in excess of his normal billing rates. Pltfs' Ex. FF, Terris Dep. pp. 23, 25. Defendant has not sought to refute any of Mr. Terris' representations in this respect. In view of the foregoing, the Court concludes that plaintiffs accepted this case on a partially contingent basis with the reasonable expectation that they would be compensated with an award large enough to make the case desirable despite the risk of loss. As such, the fact that Ms. Palmer was able to retain the services of plaintiffs' firm on a quasi-contingent basis without any particular difficulty does not alter the conclusion that she would have faced substantial difficulties in obtaining representation in the relevant market absent an enhancement of the fee award to reflect the risk of loss.

### Computation of Lodestar

In view of the foregoing discussion, the Court concludes that the appropriate hourly rate to be used in calculating the lodestar in this matter is the market's lowest prevailing hourly rate as shown in plaintiffs' community rate brackets. The hourly rate approved for each fee applicant is set forth in a chart accompanying this opinion. *See* Attachment A. The Court has then calculated the lodestar on the basis of the foregoing hourly rates, multiplied by the percentage of plaintiffs' itemized hours attributable to the junior applicant portion of this litigation. *See* Attachment B. The total award for merits and fee lodestar litigation is $291,160.43.

In addition to the lodestar award, the Court concludes that plaintiffs' request for a 50 percent enhancement of their historic fees to compensate for the risk of nonpayment, the market's lowest prevailing contingency adjustment rate, is both fair and reasonable. The Court accordingly awards plaintiffs an enhancement of the lodestar in the amount of $71,806.17. *See* Attachment

C. This amount, combined with plaintiffs' claim for expenses in the amount of $40,091.25 brings the total award to $403,057.85. *Id.* Defendant's previous payment of $219,439.40 brings the total balance of the award to $183,618.45. The parties shall submit any proposed corrections of the Court's calculation of attorney's fees in this matter within thirty days.

## ATTACHMENT A*

### APPROVED HOURLY RATES

#### Bruce J. Terris, 1957 Graduate

| Year | Experience Level | Rate Brackets | Firm Rate | Rate Approved |
|------|------------------|---------------|-----------|---------------|
| 1976 | 11–19 years | $100–125 | $35 | $90* |
| 1977 | 20+ years | $ 90–150 | $40 | $90 |
| 1978 | 20+ years | $100–150 | $45 | $100 |
| 1979 | 20+ years | $100–150 | $45 | $100 |
| 1980 | 20+ years | $110–200 | $50 | $110 |
| 1981 | 20+ years | $120–140 | $55 | $120 |
| 1982 | 20+ years | $135–250 | $60 | $135 |
| 1983 | 20+ years | $150–250 | $60–80 | $150 |
| 1984 | 20+ years | $160–250 | $65–80 | $160 |

#### Helen Cohn Needham, 1968 Graduate

| Year | Experience Level | Rate Brackets | Firm Rate | Rate Approved |
|------|------------------|---------------|-----------|---------------|
| 1976 | 7–10 years | $60–80 | $35 | $60 |
| 1977 | 7–10 years | $60–100 | $40 | $60 |
| 1978 | 7–10 years | $60–110 | $45 | $60 |

* The Court's award of $90 in 1981 is based on plaintiffs' documentation of the lowest market rate for similarly experienced attorneys in 1977.

Note: The rate approved for Bruce Terris also applies to Zona Hostetler for her work in 1976.

#### Suellen T. Keiner, 1972 Graduate

| Year | Experience Level | Rate Brackets | Firm Rate | Rate Approved |
|------|------------------|---------------|-----------|---------------|
| 1976 | 4–6 years | $60–100 | $35 | $60[1] |
| 1977 | 4–6 years | $75–90 | $40 | $60[2] |
| 1978 | 7–10 years | $60–110 | $45 | $60[3] |

#### Delmar Karlen, 1973 Graduate

| Year | Experience Level | Rate Brackets | Firm Rate | Rate Approved |
|------|------------------|---------------|-----------|---------------|
| 1978 | 4–6 years | $65–70 | $45 | $65 |
| 1979 | 4–6 years | $75–90 | $45 | $75 |
| 1980 | 7–10 years | $95–145 | $50 | $95[4] |

1. This rate also applies to Nathalie Black for her work in 1976.

2. The Court's award of $60 in 1977 is based on the lowest market rate for attorneys of greater experience in 1978.

3. This rate also applies to Philip Sunderland for his work in 1978.

4. This rate also applies to Eleanor Granger for her work in 1980.

* Attachment B has been deleted from this opinion at the request of the Court.

### Karen H. Edgecombe, 1977 Graduate [5]

| Year | Experience Level | Rate Brackets | Firm Rate | Rate Approved |
|------|------------------|---------------|-----------|---------------|
| 1980 | 1–3 years | $65–90 | $50 | $65 |
| 1981 | 4–6 years | $85–125 | $55 | $80* |
| 1982 | 4–6 years | $95–125 | $60–65 | $80* |
| 1983 | 4–6 years | $80–115 | $65 | $80 |
| 1984 | 7–10 years | $105–175 | $65 | $105 |

### Ellen Kabcenell Wayne, 1978 Graduate

| Year | Experience Level | Rate Brackets | Firm Rate | Rate Approved |
|------|------------------|---------------|-----------|---------------|
| 1982 | 4–6 years | $95–125 | $60 | $80* |
| 1983 | 4–6 years | $80–115 | $60–65 | $80 |
| 1984 | 4–6 years | $80–135 | $65 | $80 |

### Edward H. Comer, 1974 Graduate

| Year | Experience Level | Rate Brackets | Firm Rate | Rate Approved |
|------|------------------|---------------|-----------|---------------|
| 1977 | 1–3 years | $45–50 | $40 | $45 |
| 1980 | 4–6 years | $75–90 | $50 | $75 |

5. The rates approved for Karen Edgecombe apply to James Hecker for his work in 1983–1984; Susan Drake for her work in 1980; and Philip Sunderland for his work in 1984.

* The Court's award of $80 in 1981 and 1982 is based on the lowest market rate for similarly experienced attorneys in 1983 and 1984.

### Tara Harvey, 1977 Graduate

| Year | Experience Level | Rate Brackets | Firm Rate | Rate Approved |
|------|------------------|---------------|-----------|---------------|
| 1977 | less than 1 year | $40 | $40 | $40 |
| 1979 | 1–3 years | $60 | $45 | $60 |

### Carolyn A. Smith, 1980 Graduate

| Year | Experience Level | Rate Brackets | Firm Rate | Rate Approved |
|------|------------------|---------------|-----------|---------------|
| 1982 | 1–3 years | $70–95 | $60 | $70 |
| 1984 | 4–6 years | $80–135 | $65 | $80 |

### Monica Blong Wagner, 1981 Graduate

| Year | Experience Level | Rate Brackets | Firm Rate | Rate Approved |
|------|------------------|---------------|-----------|---------------|
| 1984 | 1–3 years | $80–110 | $65 | $80 |

### David Klibaner, 1979 Graduate

| Year | Experience Level | Rate Brackets | Firm Rate | Rate Approved |
|------|------------------|---------------|-----------|---------------|
| 1980 | 1–3 years | $65–90 | $50 | $65 |
| 1981 | 1–3 years | $65–90 | $55 | $65 |