Charles NORWOOD, et al., Plaintiffs,

and

Lillie Ann Stewart, Antwerp Duncan, Mildred Glenn and Charlotte Chapter of the Old North State Medical, Dental and Pharmaceutical, Intervenors,

and

Bertha Chisholm, Additional Intervenor,

and

Kim Wallace, Randy Tucker, Roberta Sasportas and Anita Singley, Additional Intervenors,

v.

CHARLOTTE MEMORIAL HOSPITAL AND MEDICAL CENTER, and Charlotte–Mecklenburg Hospital Authority, Defendants.

No. C–C–78–370–M.

United States District Court, W.D. North Carolina, Charlotte Division.

June 26, 1989.

Michael A. Sheely, Russell & Sheely, C. Margaret Errington, J. LeVonne Chambers, Chambers, Stein, Ferguson & Becton, P.A., Charlotte, N.C., for plaintiffs.

David L. Terry, John O. Pollard, J.W. Alexander, Jr., Blakeney, Alexander and Machen, Charlotte, N.C., for defendants.

## ATTORNEY FEE ORDER

McMILLAN, District Judge.

### I. PROCEDURAL HISTORY

This class action proceeding, No. C–C–78–370–M, was filed on December 19, 1978. It was consolidated with *Oliphant, et al., v. Charlotte Memorial Hospital and Medical Center, and Charlotte Mecklenburg Hospital Authority,* No. C–C–78–326–M, a similar class action filed on November 2, 1978. Plaintiffs alleged that defendants followed patterns and practices of discrimination in employment on the basis of race and color which violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.,* as amended, and 42 U.S.C. §§ 1981 and 1983.

The *Norwood* plaintiffs are represented by the law firm of Ferguson, Stein, Watt, Wallas, Adkins & Gresham, previously Chambers, Stein, Ferguson & Becton ("Ferguson law firm"). In the past, George Daly was a member of the Ferguson law firm and helped represent the *Norwood* plaintiffs. Mr. Daly withdrew as counsel in this case on February 11, 1981.

Classes were conditionally certified in both the *Oliphant* case and the *Norwood* case prior to trial and the class definitions were modified upon entry of final judgment.

Trial began on October 22, 1981, and continued through October 30, 1981. After proposed findings of fact and conclusions of law were presented to the court and commented upon by the parties, the court entered its findings of fact and conclusions of law and judgment on June 21, 1983. *Norwood* docket ("docket") ## 101 and 102.

The court certified the class as:

All black employees of defendants who have worked in or have sought or have been assigned to non-professional job positions (technical, skilled, semi-skilled and labor) who, at any time since October 13, 1973, have been discriminatorily denied a job, or discriminatorily assigned to a job, or discriminatorily denied transfer to a job, or discriminatorily discharged or subjected to retaliatory treatment or actions, because of race or color.

The court enjoined defendants from discriminating against plaintiffs and members of the class on the basis of race in initial or later job assignments, transfer, discharges and training, and from retaliating against plaintiffs and class members who challenge or seek to enforce their rights to equal employment opportunity under Title VII.

The court ordered reinstatement with back pay to the following individual *Norwood* plaintiffs: 1) Evelyn Alexander, who the court found was denied a data processing job which had been promised upon initial employment, was denied a transfer to a vacant job in 1976, and was discharged on April 3, 1978; 2) Bertha Chisholm, who was denied appointment as assistant supervisor in the lab in 1980; and 3) Lillie Ann Stewart McCain, who was denied the job of surgical technician trainee in July, 1977

and was discharged in November, 1977. The court dismissed, with prejudice, Lillie Ann Stewart McCain's claim of entitlement in 1977 to the job of data processing technician.

The court referred the claims of plaintiffs Randy Tucker, Lula Belle Miller, and other class members whose claims were not decided in the judgment, to a special master for recommendation.

Pursuant to 42 U.S.C. § 2000e–5(k), the court ruled:

14. Plaintiffs are the prevailing parties in this action. The defendants shall pay plaintiffs' reasonable attorney fees, costs and expenses including expert witnesses and consultation fees, paralegal time and unusual clerical time for all work performed in this proceeding until the date of this judgment in accordance with an order to be entered regarding fees and expenses.

15. Plaintiffs' counsel shall also receive reasonable attorney fees, costs and expenses, including paralegal time and other proper expenses, for all future work done on behalf of the plaintiffs and class members for all proceedings before the special master and for work done in the implementation of this judgment, including fees and expenses for monitoring and examining the various reports required, in answering questions of class members and in investigating any alleged violations of this judgment.

Docket # 102.

The defendants appealed, and after full briefing and argument, the United States Court of Appeals for the Fourth Circuit entered a decision on October 10, 1985. The Fourth Circuit reversed the district court's creation of a subclass of persons discriminatorily denied a job and reversed the district court's factual findings concerning *Norwood* plaintiff Evelyn Alexander, and *Oliphant* plaintiffs Wilma Oliphant and Terry Ragin. The Fourth Circuit affirmed all other aspects of the trial court's judgment. *Oliphant, et al. and Norwood, et al. v. Charlotte Memorial Hospital and Medical Center and Charlotte–Mecklenburg Hospital Authority*, 38 Empl.Prac.Dec. (CCH) ¶ 35646 (4th Cir. 1985). The Supreme Court denied the defendants' petition for certiorari on April 21, 1986. *Charlotte Memorial Hosp. v. Oliphant, et al.*, 475 U.S. 1122, 106 S.Ct. 1640, 90 L.Ed.2d 186 (1986).

On August 29, 1986, the *Norwood* plaintiffs filed an amended motion for counsel fees, costs and expenses for work performed in the case from February 6, 1974, through July 31, 1986. Docket # 127. Counsel for the *Norwood* plaintiffs expended over 1,400 hours during the twelve years of representing the plaintiffs without receiving any compensation.

In support of the motion for attorney's fees, the *Norwood* plaintiffs filed a brief (docket # 129), the second affidavit of Jonathan Wallas (docket # 128), and the affidavits of Fred A. Hicks (docket # 132), Nelson Casstevens (docket # 131), and James C. Fuller, Jr. (docket # 130). In addition, plaintiffs' counsel referred the court to their previous motion for counsel fees, costs and expenses filed on July 21, 1986 (docket # 123a), the affidavit of Jonathan Wallas (docket # 123b), and the affidavits of J. Levonne Chambers (docket ## 86 and 95), Carl Hoffman (docket # 123c), and Allan A. Parrow (docket # 90).

The defendants filed a brief in response to the *Norwood* plaintiffs' motion for counsel fees, costs and expenses. Docket # 137.

On September 9, 1986, the court held a lengthy hearing on the motion requesting attorneys' fees and on another pending motion concerning judgment on remand. On October 1, 1986, the court entered a judgment on remand (docket # 140), an order requiring notice to class members and former class members with respect to stage II proceedings (docket # 141), and a notice concerning hearings to determine appropriate relief (docket # 142).

On October 17, 1986, the *Norwood* plaintiffs filed a supplemental brief concerning future counsel fees. Docket # 144. On November 5, 1986, the defendants filed a response. Docket # 149.

By order filed February 13, 1987 (and amended February 20, 1987), this court awarded counsel fees, costs and expenses to the *Norwood* plaintiffs ("1987 fee order"). Docket # 153. 653 F.Supp. 1350.

Defendants appealed the 1987 fee order and moved for a stay which was denied by this court. Defendants thereafter moved for a stay in the United States Court of Appeals for the Fourth Circuit. On April 29, 1987, the Honorable Sam J. Ervin, III, stayed the 1987 fee order pending appeal, upon payment to the *Norwood* plaintiffs of a partial fee in the amount of $120,104.19 (which has been paid) and the posting of an appropriate bond.

On September 16, 1987, the United States Court of Appeals for the Fourth Circuit remanded this case to this court for further hearings in light of the intervening decisions of the United States Supreme Court in *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air ("Delaware Valley II")*, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) (setting forth guidelines for the use of a contingency enhancement), and in *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987) (affecting expert witness fee awards).

Both parties have now agreed that reconsideration of the award of expert witness fees in light of *Crawford Fitting* should be delayed until certain cases now pending at the United States Supreme Court concerning this same issue are decided. The court concurs and, therefore, has omitted any award of expert witness fees from this order. That issue will be considered after the parties advise the court that the relevant cases have been decided, or the court determines that the issue is ripe for consideration.

On April 18, 1988, plaintiffs moved for an award of counsel fees, costs and expenses upon remand. In addition to the papers filed in support of their August, 1986, motion, plaintiffs filed: 1) the 1988 affidavits of Jonathan Wallas and J. Le-Vonne Chambers; 2) the affidavits of Samuel Millette, George Daly, James L. Fuller, Jr. (his second affidavit), Travis Payne, Re-

gan Miller, Shelley Blum, Cornelius A. Manly, James J. Wall, Louis L. Lesesne, Chesterfield Smith, Joseph C. Jacobs, Linwood O. Foust, Joyce M. Brooks, Mary Olene Sampson, William H. Ewing, Michael Churchill, Jerry G. Traynham, Carolyn McAllaster, Jeff Bishop and W. Thomas Ray; and 3) a brief on behalf of both *Norwood* and *Oliphant* plaintiffs in support of their motions for counsel fees, costs and expenses upon remand. Docket ## 180–200. In addition, over the course of the past year, plaintiffs' counsel has periodically brought additional relevant cases to the court's attention.

On May 20, 1988, defendants filed a response in opposition to plaintiffs' April 18, 1988, motion. Docket # 204.

## II. DETERMINATION OF A REASONABLE ATTORNEY FEE

*A. The law on the proper analysis of an attorney fee award.*—Numerous judicial opinions set forth formulas and how they should be used to create that mythical beast—a reasonable attorney fee. Those methods and numerical manipulations share one "simple" objective—to provide counsel with a *reasonable* fee for the services provided in a particular case, no more and no less. In awards made pursuant to fee-shifting statutes, such as this one, the fee also should be "adequate to attract competent counsel, but ... not produce windfalls to attorneys." S.Rep. No. 1011, 94th Cong., 2d Sess. 6, *reprinted in* 1976 U.S.Code Cong. & Admin.News 5908, 5913. A modicum of consistency (and therefore predictability) and expediency are also desirable.

It is no small achievement to reach these goals; to reach them in a manner that will be found acceptable by reviewing courts is indeed a feat.

As Judge Sarokin aptly commented, in reference to *Delaware Valley II:*

The Supreme Court has sent a Christmas gift to this court delivered via the Third Circuit Court of Appeals. It is called "How to Make an Attorney Fee Multiplier." However, the instructions are so confusing and inconsistent that

this court has been unable to put the "gift" together.

*Blum v. Witco Chemical Corp.*, 702 F.Supp. 493, 494 (D.N.J.1988).

The variety of methods that have been set forth for district courts to employ, and the painstaking reviews given to trial court determinations are causing what should be a secondary, mopping-up task of the courts to absorb as much judicial resources as do opinions on the merits of a case. Yet the stated intent of the Supreme Court is that a "request for attorney's fees should not result in a second major litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983).[1]

The difficulties courts experience in applying the "instructions" can be traced back to the Fifth Circuit opinion in *Johnson v. Georgia Highway Express*, 488 F.2d 714, 717–19 (5th Cir.1974) (adopted by this circuit in *Barber v. Kimbrell's*, 577 F.2d 216, 226 (4th Cir.1978), *cert. denied*, 439 U.S. 934, 99 S.Ct. 329, 58 L.Ed.2d 330 (1978)). *Johnson* set forth twelve factors to be considered when determining an award of attorney's fees:

(1) The time and labor required;

(2) The novelty and difficulty of the questions;

(3) The skill requisite to perform the legal service properly;

(4) The preclusion of other employment by the attorney due to acceptance of the case;

(5) The customary fee;

(6) The nature and length of the professional relationship with the client;

(7) Time limitations imposed by the client or the circumstances;

(8) The amount involved and the results obtained;

(9) The experience, reputation and ability of the attorneys;

(10) The "undesirability" of the case;

(11) Whether the fee is fixed or contingent; and

(12) Awards in similar cases.

Fourth Circuit law initially required that in applying *Johnson*, the lower court should, first, "multiply the number of hours reasonably expended by the *customary* hourly rate to determine an initial amount for the fee award. Finally, the court should adjust the fee on the basis of the other factors, briefly explaining how they affected the award." *Anderson v. Morris*, 658 F.2d 246, 249 (4th Cir.1981) (emphasis added).

Prior to the Fifth Circuit's decision in *Johnson*, the Third Circuit had proposed the "lodestar" method of calculating a reasonable attorney fee. *Lindy Bros. Bldrs, Inc. of Phila. v. American R. & S. San. Corp.*, 487 F.2d 161 (3d Cir.1973). Under this method, the court was expected first to determine the "lodestar" by multiplying the number of hours spent on the case by a reasonable hourly rate of compensation, which was presumed to be reflected in the attorney's normal billing rate. Next, the court could adjust the lodestar, considering two factors: (1) "the contingent nature of success" and (2) "the extent, if any, to which the quality of an attorney's work" warrants adjusting the fee. *Id.* at 168.

The next step in the attorney fee saga was the enunciation of a method of calculation that is a hybrid between the Fifth Circuit's *Johnson* approach and the Third Circuit's lodestar method. *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air* ("*Delaware Valley I*"), 478 U.S. 546, 562–65, 106 S.Ct. 3088, 3096–98, 92 L.Ed.2d 439

---

**1.** *See also* the following pertinent statement in the dissent in *Hensley v. Eckerhart* (J. Brennan, concurring in part and dissenting in part, with whom J. Marshall, J. Blackmun and J. Stevens join):

Vacating a fee award such as this and remanding for further explanation can serve only as an invitation to losing defendants to engage in what must be one of the least socially productive types of litigation imaginable: appeals from awards of attorney's fees, after the merits of the case have been concluded, when the appeals are not likely to affect the amount of the final fee. Such appeals, which greatly increase the costs to plaintiffs of vindicating their rights, frustrate the purposes of § 1988.

461 U.S. at 442, 103 S.Ct. at 1944.

(1986). Under *Hensley* and *Blum*, courts are to start by determining a lodestar; however, unlike the method used by the Fourth Circuit, most of the *Johnson* factors are to be used in *calculating* the lodestar figure, rather than in subsequently *adjusting* that figure. *See Daly v. Hill*, 790 F.2d 1071, 1078 (4th Cir.1986) ("*Blum* has shifted the timing of the *Johnson* analysis, as it has been applied in this circuit. . . . the lodestar fee is now the proper focus of the entire *Johnson* analysis in most cases."); *Delaware Valley I*, 478 U.S. 546, 566, 106 S.Ct. 3088, 3099, 92 L.Ed.2d 439 (1986) ("[T]he lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee. . . ."). In short, the definition of a lodestar had been altered from "reasonable hours × customary rate" to "reasonable hours × reasonable rate under all the circumstances."

Though the *Johnson* factors were now already considered in determining the reasonable rate, the Court concluded in *Blum v. Stenson* that in rare cases an upward adjustment of a lodestar fee might still be appropriate. At the same time, the court criticized any upward adjustments that were based upon "double counting" of *Johnson* factors. *Blum v. Stenson*, 465 U.S. at 897–99, 104 S.Ct. at 1548–49. In fact, this court, while not eliminating the possibility, has been unable to discover any relevant factor that would justify an adjustment to a fee award that is not already encompassed in one or more of the *Johnson* factors.

Most recently, however, in *Blanchard v. Bergeron*, —— U.S. ——, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989), and in *Delaware Valley II*, the Supreme Court seems to indicate a return to the Fourth Circuit's original approach of multiplying the number of hours reasonably expended by the attorney's prevailing billing rates and then using the remaining factors to adjust the lodestar. " . . . [I]n *Hensley* and in subsequent cases, we have adopted the lodestar approach as the centerpiece of attorney's fee awards. The *Johnson* factors may be relevant in *adjusting* the lodestar amount. . . ."

*Blanchard*, —— U.S. at ——, 109 S.Ct. at 945.

Thus, in contemplating the various rulings on attorney's fee awards, it appears that much of the confusion stems from one fundamental issue: The definition of a "lodestar."

In *Blanchard v. Bergeron*, the Supreme Court stated:

> *Hensley v. Eckerhart*, 461 U.S. 424 [103 S.Ct. 1933, 76 L.Ed.2d 40] (1983), directed lower courts to make an initial estimate of reasonable attorney's fees by applying *prevailing billing rates* to the hours reasonably expended on successful claims. And we have said repeatedly that "[t]he initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a *reasonable hourly rate*." *Blum v. Stenson*, 465 U.S. 886, 888, 104 S.Ct. 1541, 1544, 79 L.Ed.2d 891 (1984).

—— U.S. ——, ——–——, 109 S.Ct. 939, 944–45, 103 L.Ed.2d 67 (1989) (emphasis added).

A lodestar figure can be *either:* (1) the reasonable hours expended multiplied by the *prevailing billing* rates for an attorney's general services *or* (2) the reasonable hours expended multiplied by the *reasonable hourly rate* for an attorney's services in a particular case. These are *not* the same. For example, the *prevailing* market rate for an attorney with five years of experience might be $130.00 per hour. However, the *reasonable* hourly rate for an attorney with five years of experience in a specialized area of law working on a contingent fee basis in a case involving large stakes and complex, novel issues and time pressures, and resulting in an exceptional success, might be $400.00 per hour or more.

The definition of lodestar that is used determines the appropriate timing of the consideration of the *Johnson* factors. Under the first definition above, two of the *Johnson* factors would determine the lodestar. The remaining ten factors would be appropriately considered when deciding whether to adjust the lodestar. In the second definition, all of the *Johnson*

factors would be considered in determining the lodestar, which would equate to a reasonable fee in the case without further adjustment.

It appears that, in either case, the final sum would remain the same. For example, Chambers' fee in this case would remain $169,190.00 under either method of calculation. Under a typical lodestar method, Chambers' fee would be calculated as follows:

| Actual Hours–10% | Hourly Rate | Contingency Multiplier | Total |
|---|---|---|---|
| 537.15 −53.72 = 483.40 | × $175.00 | × 2.0 = | $169,190.00. |

Under a comprehensive "reasonable hours × reasonable rates" method, the *result* would be the same, but the *timing* of the math would change:

| Actual Hours–10% | Reasonable Hourly Rate | Total |
|---|---|---|
| 537.15 −53.72 = 483.40 | × $350.00 = | $169,190.00. |

---

A rereading of the opinion in *Johnson* reveals that the factors set forth in *Johnson* were originally described by that court as *guidelines* with the caveat that "we do not attempt to reduce the calculation of a reasonable fee to mathematical precision." *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 720 (5th Cir.1974). The court set forth the guidelines in response, it seemed, to a dearth of explanations as to how a given attorney fee was determined. It was impossible for the appellate court to determine whether a judge had abused his discretion in a fee award when the basis of that award was never elucidated. Thus, so long as a reasonably detailed explanation is made of a fee award, the intent of *Johnson* and other appellate opinions will be followed. The order and timing of the consideration of the *Johnson* factors seem irrelevant, provided each factor is considered only once.

■ In the interests of coherence and clarity, this court will base this and future analyses of attorney fee awards upon the definition of "lodestar" as reasonable hours multiplied by reasonable hourly rates, thus reducing the so-called two step process into one complete analysis and essentially bypassing the calculation of any intermediary figure such as a lodestar.

B. *Analysis of the twelve Johnson factors.*

1. *The Time and Labor Required.*— The two affidavits of J. LeVonne Chambers, with attached time sheets (docket ## 86 and 95), the two affidavits of Jonathan Wallas with attached time sheets (docket ## 123b and 128), and a supplement to the second affidavit of Jonathan Wallas (docket # 138) show the total hours spent by the various *Norwood* attorneys. Robert Belton opened the *Norwood* file in February, 1974. Mr. Belton worked as lead attorney in the case until he left the Ferguson law firm in 1975, and spent a total of 9.5 hours on the case. J. LeVonne Chambers became the *Norwood* plaintiffs' principal lawyer in 1975, and spent a total of 537.15 hours on the case. George Daly assisted Mr. Chambers in preparing the case for trial and spent 100.75 hours on the case in 1980. Gilda Glazer assisted Mr. Chambers in trial preparation and spent 268.75 hours on the case. John Nockleby became the *Norwood* plaintiffs' lead counsel following the court's 1983 judgment and spent 470.90 hours on the case. Jonathan Wallas assisted Mr. Chambers in post trial findings, assisted Mr. Nockleby with the appeal, and assumed primary responsibility for the filing of the fee petition. Mr. Wallas spent 93.75 hours on the case. Other

attorneys who have worked on the case include: Leslie Winner (3.75 hours), Geraldine Sumter (10.0 hours), John Gresham (3.0 hours), and Melvin L. Watt (1.0 hour).

The affidavits of Mr. Chambers and Mr. Wallas show the following time was devoted to the case by law clerks:

| | |
|---|---|
| Nicole Bynum | 14.50 hours |
| Laurie Tyler | 173.35 hours |
| M. Olene Sampson | 182.80 hours |
| Michele Nethercott | 52.50 hours |
| Rhonda Lipkin | 72.00 hours |
| Bernadette Moffat | 40.40 hours |
| Kelly McGrath | 56.30 hours |

The affidavits also show that paralegals for the *Norwood* plaintiffs' law firm spent a total of 977.30 hours on the case.

Jonathan Wallas states in his affidavit that the *Norwood* plaintiffs' law firm exercised "billing judgment" in eliminating time thought to be excessive or unreasonable. Docket # 123b. In addition, the hours actually expended, as set forth above, will be reduced by ten percent to reflect hours expended on issues on which plaintiffs did not prevail. *See* II. B. 7, *infra.*

2. *The Novelty and Difficulty of the Questions.*—The legal questions were not novel or difficult. The factual questions of class wide and individual discrimination were not novel, but were somewhat complicated. This factor does not favor a particularly high or low fee.

3. *The Skill Requisite to Perform the Legal Service Properly.*—Employment discrimination cases, particularly class actions, require considerable skill because they are factually complicated and require extensive discovery. Employment discrimination cases are, for example, generally more complicated than routine contract, automobile accident or products liability cases.

In this particular case, considerable skill was required to develop and analyze complicated statistical evidence, to digest and organize complex facts, and to present the facts in an orderly and efficient manner at trial. In addition, the defendants raised numerous issues on appeal seeking reversal. Considerable skill was required to present to the court of appeals the factual and legal authority supporting the plaintiffs' position.

This factor weighs in favor of a high fee.

4. *The Preclusion of Other Employment by the Attorney due to Acceptance of the Case.*—Although the *Norwood* plaintiffs' counsel emphasize the large amount of time and effort they expended on the case, they do not claim that they were precluded from accepting other employment. This factor is not material to this case.

5. *The Customary Fee.*—The *Norwood* plaintiffs assert that the attorneys involved in this case customarily receive the following rates:

| | |
|---|---|
| Mr. Chambers | $175.00 per hour |
| Mr. Daly | $150.00 per hour |
| Mr. Belton | $140.00 per hour |
| Mr. Wallas | $140.00 per hour |
| Mr. Watt | $140.00 per hour |
| Mr. Gresham | $125.00 per hour |
| Ms. Winner | $125.00 per hour |
| Mr. Nockleby | $115.00 per hour |
| Ms. Glazer | $100.00 per hour |
| Ms. Sumter | $ 90.00 per hour |

The above figures are based on the 1986 rates charged by the attorneys in non-contingent cases.

The *Norwood* plaintiffs also assert that customary rates are $40.00 per hour for summer law clerk time, $35.00 per hour for paralegal time, and $60.00 per hour for a 1985 law school graduate admitted to the North Carolina bar in September, 1986, such as Mary Olene Sampson.

This litigation began over ten years ago. When the 1987 fee order was entered, the attorneys had already spent more than 1400 attorney hours in this case and no fee payments had been received.

In *Daly v. Hill,* 790 F.2d 1071, 1081 (4th Cir.1986), the Fourth Circuit noted that when litigation spans a period of years during which no fee payments are received, the trial court must make an appropriate adjustment to historic rates to prevent dilution of the prevailing plaintiffs' lawyers' fees. The court held that the trial court has discretion to use current market rates or to otherwise increase the rates to "counterbalance the effect of inflation and fore-

gone interest on the value of the fee." 790 F.2d at 1081. This court has, in the past, used current rates. *See Chisholm v. United States Postal Service,* 570 F.Supp. 1044, 1046 (W.D.N.C.1983). Using the rates prevailing when fees are actually awarded is an appropriate way to adjust historic rates to prevent dilution of the fees of counsel for the *Norwood* plaintiffs. The court used the then prevailing rates in the 1987 fee order. Since 1987, the award has been appealed and remanded, resulting in an additional delay of two years. Rather than awarding prevailing 1989 rates in reconsidering the award, the court will retain the 1987 figures and award interest to prevent any dilution of the fees due to the additional two year delay.

This court previously discussed in considerable detail fees charged during the relevant time period by local law firms. *See Thomas v. Cooper Industries,* 640 F.Supp. 1374 (W.D.N.C.1986). Furthermore, in this case, the *Norwood* plaintiffs' counsel have submitted affidavits from attorneys James C. Fuller, Nelson Casstevens and Fred A. Hicks, all of whom are familiar with the work of the *Norwood* plaintiffs' counsel, the work of this court, and the prevailing rates in this market.

Mr. Fuller states in his affidavit that he is familiar with the work of the *Norwood* plaintiffs' counsel and that the rates counsel assert as customary are in line with the non-contingent rates charged by similarly situated lawyers in the Charlotte legal community. Docket # 130.

Mr. Casstevens also states that the rates asserted as customary by the *Norwood* plaintiffs' counsel are within the range of non-contingent fees charged by similarly situated attorneys in the Charlotte legal community. Docket # 131.

The customary rates set forth by counsel for the *Norwood* plaintiffs are in line with the customary fees charged by similarly situated lawyers within the local legal community.

6. *Time Limitation Imposed by the Client or the Circumstances.*—There is no evidence that the time limitation in this case was either strict or lax, or that the case was in any way unusual in this respect. This factor favors neither a high nor a low fee.

7. *The Amount Involved and the Results Obtained.*—In *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the Supreme Court held that the extent of a plaintiff's success is an important factor that a district court should consider in determining the amount of fees to be awarded:

> Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified. In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit.... Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters.

461 U.S. at 435, 103 S.Ct. at 1940. The Court emphasized that "the most critical factor is the degree of success obtained." 461 U.S. at 436, 103 S.Ct. at 1941.

Defendants argue that the results obtained by the *Norwood* plaintiffs do not justify the fee counsel seeks, because plaintiffs obtained relief in only a total of eleven out of thirty-seven claims, less than 30 percent of the total number of claims asserted. The Supreme Court in *Hensley* expressly rejected a mathematical approach which compares the total number of issues in the case to those actually prevailed upon, stating that "such a ratio provides little aid in determining what is a reasonable fee in light of all the relevant factors." 461 U.S. at 435 n. 11, 103 S.Ct. at 1940 n. 11.

The *Norwood* plaintiffs have been successful in this litigation and are the prevailing parties. The extent of relief to be provided to the plaintiffs is not entirely known at this time because Stage II proceedings are still pending before a special

master. However, some of the excellent results obtained in this litigation include:

1) All class members who have been discriminatorily assigned, denied transfer, discharged, or subjected to retaliatory treatment because of their race or color will be given the opportunity to present their claims to the special master and to be awarded appropriate relief. *In excess of 4700 class members are eligible* to file claims concerning discrimination occurring between 1973 and 1983.

2) The defendants have been enjoined from discriminating against class members with respect to those matters where classwide discrimination was found.

3) A number of individual plaintiffs, including Pamela Bennett, Ruth Coleman, Kim Wallace, Lillie Ann Stewart McCain, and Bertha Chisholm have won individual relief, the details of which will be determined by the special master.

4) The defendants will now be required to post job notices throughout their facilities and to accept job bids from employees. This job posting and bidding system is a significant improvement over prior practice of the defendants.

5) The defendants are now required to canvass class members to learn their qualifications and their interest in transfer and promotion, to establish and maintain job descriptions, and to use job related criteria for various jobs at their facilities.

6) The defendants are required to submit reports for at least three years which will enable plaintiffs' counsel to ensure that the court's orders are carried out.

In the 1987 fee order, the court found that the overall success obtained by the plaintiffs entitled the plaintiffs' counsel to a fully compensatory fee for all of the hours claimed. Even though the plaintiffs did not ultimately succeed on every issue, plaintiffs were successful in bringing to an end pervasive race discrimination by the defendants.

■ However, in their motion of April 18, 1988, plaintiffs have voluntarily reduced the number of hours sought in their 1986 motions and awarded in the 1987 fee order. Plaintiffs have made this reduction as a reasonable response to defendants' claims that the fees should be reduced because plaintiffs did not prevail on *all* of their claims. The ten percent figure is supported by the 1988 affidavit of Julius LeVonne Chambers at paragraph 6. Docket # 190. The ten percent reduction of the hours spent is not *mandated* by the circumstances of this case. Nevertheless, out of an abundance of caution, and to err on the side of conservatism, the court will adopt the ten percent reduction in plaintiff's hours set forth in plaintiffs' April 18, 1988, motion.

8. *The Experience, Reputation and Ability of the Attorneys.*—J. LeVonne Chambers was a founding partner of the Ferguson law firm. Mr. Chambers, a nationally prominent civil rights attorney, is presently Director–Counsel of the NAACP Legal Defense & Educational Fund, Inc. Chambers' experience in civil rights litigation is outstanding. His reputation as a top-flight advocate is well deserved.

George Daly is an experienced civil rights litigator. He has tried scores of cases in federal and state courts and has argued approximately fifty appeals. Mr. Daly is a lawyer of outstanding ability. He has an excellent and well deserved reputation, particularly in employment discrimination cases.

Robert Belton is presently a Professor of Law at Vanderbilt University School of Law, where he specializes in employment discrimination litigation. While a member of the Ferguson law firm, Mr. Belton was lead attorney in a number of major employment discrimination class actions. Mr. Belton is an acknowledged expert in Title VII and employment discrimination law.

Jonathan Wallas, a former law clerk to this court, is an experienced and skilled civil rights litigator. Mr. Wallas has been litigating employment discrimination cases for about sixteen years and is currently the lead attorney in charge of overseeing all employment discrimination cases handled by the Ferguson law firm. The court

knows the work of Mr. Wallas well. He is a lawyer of outstanding ability.

Melvin Watt is an active litigator of great skill and success who has been involved in a number of civil rights cases including *Caldwell v. Seaboard Coast Line Railway.*

John Gresham was a law clerk to this court before he began practice in 1976. He has considerable experience in litigating employment discrimination cases. The court knows his work well. He is a lawyer of high ability.

Leslie Winner, another former law clerk, is an experienced civil rights advocate and trial attorney. She has handled a number of employment discrimination cases and in addition is well known for her work in major voting rights cases. She is a lawyer of exceptional ability.

John Nockleby began practicing law in 1981, after clerking for Judge Murnaghan of the Fourth Circuit Court of Appeals. Since 1981, he has been involved in numerous employment discrimination cases, at both the trial level and the appellate level. Mr. Nockleby has considerable litigation experience. He is a conscientious and skilled lawyer.

Gilda Glazer practiced with the Ferguson law firm from 1981 to 1984. During that time she was primarily an employment discrimination litigator. Ms. Glazer was involved in several major employment cases while practicing with the Ferguson law firm.

Geraldine Sumter began practicing with the Ferguson law firm in 1982, after clerking for Judge Charles Becton of the North Carolina Court of Appeals. She devotes almost all of her time to employment discrimination litigation. Ms. Sumter has been actively and capably involved in a number of employment discrimination cases.

9. *The "Undesirability" of the Case.*— Where, as here, a contingency fee arrangement is present, this factor is now subsumed within the analysis of the contingency fee factor as set forth in *Delaware*

*Valley II,* 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987). *See* II. B. 11, *infra.*

10. *Nature and Length of the Professional Relationship with the Client.*—The *Norwood* plaintiffs' counsel have had no other professional relationship with the plaintiffs.

11. *Whether the Fee is Fixed or Contingent.*—The fee in this case was contingent upon success, both on the merits of the case and on the merits of the fee petition.

The *Norwood* plaintiffs' counsel ask that the court award a multiplier of 2.0 to the prevailing market rates because of the risk of nonpayment. At the hearing on plaintiffs' motion for attorney fees, counsel for plaintiffs stated that plaintiffs were seeking this multiplier for attorney time, law clerk time and paralegal time, not just attorney time. Defendants oppose any increase in the fees based upon this factor, arguing that such an enhancement is barred by the ruling in *Delaware Valley II,* 483 U.S. 711, 107 S.Ct. 3078.

In *Delaware Valley II,* a 4–1–4 decision, Justice White, joined by the Chief Justice, Justice Powell and Justice Scalia, found that enhancement of a reasonable fee to compensate for the risk of loss inherent in a contingent fee arrangement is not permissible. Justice O'Connor concurred in the judgment that a multiplier was not acceptable in that case, but found that Congress did not foreclose the use of a contingency multiplier. Justice Blackmun, joined by Justice Brennan, Justice Marshall and Justice Stevens, dissented and found that Congress allowed for the use of a contingency multiplier and that the case should be remanded to the district court for further findings.

To date, at least seven circuits, including the Fourth Circuit, and several district courts, have determined that under *Delaware Valley II,* a contingency multiplier is acceptable in appropriate cases. *Spell v. McDaniel,* 824 F.2d 1380, 1404 (4th Cir. 1987); *Craig v. Secretary, Dept. of Health & Human Serv.,* 864 F.2d 324 (4th Cir. 1989); *Fadhl v. City & County of San Francisco,* 859 F.2d 649 (9th Cir.1988);

*Lattimore v. Oman Const.,* 868 F.2d 437 (11th Cir.1989); *Fite v. First Tennessee Production Credit Association,* 861 F.2d 884 (6th Cir.1988); *Gilbert v. City of Little Rock, Ark.,* 867 F.2d 1063 (8th Cir.1989); *Friends of the Earth v. Eastman Kodak Co.,* 834 F.2d 295 (2d Cir.1987); *McKenzie v. Kennickell,* 875 F.2d 330 (D.C.Cir.1989).

The Fourth Circuit has held that, "[w]ithin the divided *Delaware Valley* Court, Justice O'Connor's position in concurrence controls on the circumstances in which a contingency multiplier may ever be allowable." *Spell v. McDaniel,* 824 F.2d at 1404. In *Spell v. McDaniel,* the Fourth Circuit cited two critical constraints presented in Justice O'Connor's concurrence that must be considered in determining whether to enhance a fee:

> 1) "no enhancement for risk is appropriate unless the applicant can establish that without an adjustment for risk the prevailing party 'would have faced substantial difficulties in finding counsel in the local or other relevant market,' " this being the basic purpose of § 1988, ...; and 2) no enhancement for risk should be allowed on the basis of " 'legal' risks or risks peculiar to the case" since these risks are adequately taken into account in fixing the "lodestar" figure....

*Ibid* (quoting *Delaware Valley II,* 483 U.S. 711, 733–34, 107 S.Ct. 3078, 3091, 97 L.Ed.2d 585 (1987)). Other courts have cited the plurality's concern in *Delaware Valley II* that enhancement be awarded only in exceptional cases as an additional constraint to be considered. *Leroy v. City of Houston,* 831 F.2d 576, 583–84 (5th Cir.

1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1735, 100 L.Ed.2d 199 (1988).

 Without passing judgment upon the "exceptional" nature of any other type of case, this court finds that class action employment discrimination cases are exceptional in their suitability for a contingency enhancement. This finding is based upon an analysis of such cases in relation to the relevant market, in this case the market in North Carolina for employment discrimination cases.[2]

Plaintiffs have filed a number of affidavits in support of their April 18, 1988, motion, from North Carolina lawyers who practice in Charlotte or in other parts of the state. These affidavits, together with affidavits previously filed, provide substantial evidence as to: (1) the relevant attorney market; (2) the problems that market conditions create for prospective plaintiffs who have arguably meritorious cases; and (3) the contingency enhancement which is necessary to ensure that attorneys will undertake contingent civil rights litigation.

Based on those affidavits, the court finds:

 (1) Employment discrimination cases and civil rights cases are not favored: (a) because they usually involve complex and difficult litigation; (b) because the cases are much more difficult to settle than contingency cases such as personal injury cases; and (c) because lawyers who undertake to represent plaintiffs in such cases on contingency bear substantial risks. Fuller 1988 affidavit at paragraph 8; Foust affidavit at paragraph 5; Wallas 1986 affidavit at paragraphs 27 & 30; Bishop affidavit at

---

**2.** Plaintiffs' evidence as to the pertinent market consists of the affidavits of Jonathan Wallas filed July 21, 1986 ("Wallas 1986 affidavit"); the affidavits of Charles V. Thompkins, Jr. ("Thompkins affidavit") and William K. Diehl ("Diehl affidavit") filed in the case of *Thomas v. Cooper Industries* and attached to Wallas' affidavit filed August 29, 1986; the affidavits of James C. Fuller ("Fuller 1986 affidavit"), Nelson Casstevens ("Casstevens affidavit") and Fred A. Hicks ("Hicks affidavit"), all filed August 29, 1986; the affidavit of Michael Sheely filed July 24, 1986 ("Sheely 1986 affidavit"), the 1988 affidavit of Jonathan Wallas ("Wallas 1988 affidavit"), the 1988 affidavit of Julius LeVonne

Chambers ("Chambers 1988 affidavit"), the April 1988 affidavit of Michael Sheely ("Sheely 1988 affidavit"), the second affidavit of James C. Fuller, Jr. ("Fuller 1988 affidavit") and the affidavits of Regan A. Miller, Cornelius A. Manly, George Daly, James J. Wall, Linwood O. Foust, Joyce M. Brooks, Samuel M. Millette, W. Thomas Ray, Jeffrey L. Bishop, Shelley Blum, Travis Payne, Carolyn McAllaster, Louis L. Lesesne, Jr. (a declaration); and the affidavits of Chesterfield Smith, Jerry G. Traynham, Joseph C. Jacobs, William H. Ewing, R. Lawrence Ashe, Jr. and Michael Churchill attached to the Wallas 1988 affidavit.

paragraph 3; Ray affidavit at paragraph ix; Diehl affidavit at paragraph 14; Brooks affidavit at paragraph 5; Miller affidavit at paragraphs 4 & 5; Blum affidavit at paragraph 17; Lesesne declaration at paragraph 10; Thompkins affidavit at paragraph 8; Daly affidavit at pp. 2–3; Fuller 1986 affidavit at paragraph 12; Millette affidavit at paragraph 5; Casstevens affidavit at paragraphs 6 & 7; Smith affidavit at paragraph 7. *See Thomas v. Cooper Industries,* 640 F.Supp. 1374, 1378 (W.D.N.C.1986) ("Employment discrimination cases are not particularly popular among lawyers. They are factually complicated and difficult to prove. A great deal of discovery is required, and plaintiffs are usually poor, or at least, not able to pay the lawyer 'up front.' ").

[In one sense the risks in statutory fee cases are not as great as in traditional contingency agreements, because *if* the plaintiff does prevail, counsel is theoretically entitled to recover full payment of the time reasonably expended rather than being additionally dependent upon the actual size of the recovery. *Blum v. Witco Chemical Corp.,* 702 F.Supp. 493 (D.N.J. 1988). Conversely, however, there is no possibility of a windfall in statutory cases based upon a large monetary recovery such as may occur in personal injury cases.]

(2) Because of the economic realities and difficulties inherent in handling employment discrimination cases for plaintiffs on a contingency basis, particularly sizeable class actions such as this, it is difficult to find attorneys to represent employment discrimination plaintiffs with arguably meritorious cases. Payne affidavit at paragraph 5; McAllaster affidavit at paragraphs 4 & 5; Manly affidavit at paragraph 3; Millette affidavit at paragraph 9; Hicks affidavit at paragraphs 9 & 10; Daly affidavit at 4–5; Fuller 1986 affidavit at paragraphs 11 & 12; Wall affidavit at paragraph 2; Fuller 1988 affidavit at paragraphs 3 & 7; Diehl affidavit at paragraph 14; Sheely 1988 affidavit at paragraphs 6, 8 & 19; Bishop affidavit at paragraph 7; Ray affidavit at paragraph v; Casstevens affidavit at paragraph 7; Foust affidavit at paragraph 3; Blum affidavit at paragraphs

13 & 14. As Jim Fuller states in his 1988 affidavit (paragraph 3), there is "near zero demand in the marketplace of attorneys" for civil rights actions. *See also* Traynham affidavit at paragraph 2.

(3) Some private attorneys who once undertook employment discrimination cases on a contingent basis will no longer take on additional employment discrimination cases on contingency. Millette affidavit at paragraph 8; Miller affidavit at paragraph 6; Foust affidavit at paragraphs 5 & 6; Ray affidavit at paragraphs vii & ix; McAllaster affidavit at paragraph 4; Sheely 1988 affidavit at paragraphs 5, 12 & 18; Payne affidavit at paragraph 3; Blum affidavit at paragraph 9; Lesesne declaration at paragraphs 7 & 8, Daly affidavit at 4 (as to class actions); Bishop affidavit at paragraph 5.

(4) Because private attorneys are either unable or unwilling to undertake any additional cases on a contingency basis or will accept only a very limited number of the arguably meritorious cases which come to them, a number of prospective plaintiffs with what appear to be good cases are being turned away by attorneys in Charlotte and throughout North Carolina. McAllaster affidavit at paragraphs 4 & 6; Miller affidavit at paragraph 7; Brooks affidavit at paragraphs 5 and 7; Ray affidavit at paragraph ix; Daly affidavit at 4; Sheely 1988 affidavit at paragraph 6; Wall affidavit at paragraph 3; Bishop affidavit at paragraph 6; Lesesne declaration at paragraph 7; Payne affidavit at paragraph 3.

Plaintiffs' evidence further demonstrates that individuals desiring to find attorneys who are willing to undertake employment discrimination cases on a contingency basis have historically in North Carolina had difficulty finding attorneys to represent them. The 1988 affidavit of Julius LeVonne Chambers indicates that when this case was filed in 1978, few attorneys were willing to handle contingent employment discrimination cases, and even fewer would undertake complex class actions on a contingency basis. Since Chambers and his law firm were willing to consider such

cases, Chambers and his colleagues received numerous referrals from other attorneys who were not willing to represent plaintiffs on a contingent basis. However, Chambers and his law firm were unable to represent all those prospective plaintiffs who had arguably meritorious cases. Chambers 1988 affidavit at paragraph 7. The effects of market conditions are highlighted by the fact that while there were only a few attorneys willing to take on employment discrimination cases on contingency, there was always a ready market of lawyers available to handle arguably meritorious personal injury and medical malpractice cases or to defend employment cases. Chambers' 1988 affidavit at paragraph 8; Wallas 1988 affidavit at paragraphs 18 & 19.

(5) There are areas in the state where it is impossible to find attorneys who will take employment discrimination cases on a contingency basis. Wall affidavit at paragraph 2; Payne affidavit at paragraph 8; McAllaster affidavit at paragraphs 4 and 5.

(6) There will not be an adequate number of attorneys ready, willing and able to handle employment discrimination cases on a contingent basis, unless an upward adjustment is made to normal non-contingent hourly fees. If such adjustments were normally made, it appears that the private bar would become more actively involved in undertaking representation in employment discrimination and other civil rights cases. Wall affidavit at paragraph 3; Casstevens affidavit at paragraph 7; Brooks affidavit at paragraphs 7 & 11; Diehl affidavit at paragraph 14; Sheely 1988 affidavit at paragraph 20; Millette affidavit at paragraph 7; Thompkins affidavit at paragraph 8; Daly affidavit at 6.

(7) In order to attract attorneys in Charlotte and in North Carolina, a contingency enhancement of at least one hundred percent (100%) (*i.e.,* an upward adjustment of doubling the normal non-contingent hourly rate) is indicated in employment discrimination actions. Fuller 1988 affidavit at paragraph 11; Ray affidavit at paragraph xi; McAllaster affidavit at paragraph 7; Lesesne declaration at paragraph 12; Brooks

affidavit at paragraph 9; Millette affidavit at paragraph 12; Fuller 1986 affidavit at paragraph 13; Foust affidavit at paragraph 8; Blum affidavit at paragraph 18; Sheely 1988 affidavit at paragraph 21; Casstevens affidavit at paragraph 6; Bishop affidavit at paragraph 8; Payne affidavit at paragraph 6. *See also* Smith affidavit at paragraph 12 (enhancement of 1.5 to 3.0 normal hourly rates needed); Traynham affidavit at paragraph 6 (enhancement of 2.5 needed); Jacobs affidavit at paragraph 6 (enhancement of 2.0 to 3.0 necessary).

No contingency enhancement will be awarded for paralegal or law clerk time. The support staff are presumably compensated regardless of the outcome of a case. It is not necessary to provide independent attraction to get paralegals and law clerks to work on employment discrimination cases.

The evidence and findings summarized above are exactly what the court understood to be the situation when it entered the 1987 fee order.

In the interests of time and consistency, the court endorses Justice O'Connor's admonition that "district courts and courts of appeals should treat a determination of how a particular market compensates for contingency as controlling future cases involving the same market." *Delaware Valley II,* 483 U.S. at 733, 107 S.Ct. at 3090. Should a particular employment discrimination case be so unusual as to make this analysis of the market inapplicable, the parties should bring this to the court's attention *before* trial, so an assessment of the specific circumstances and risks of that case can be made without the distorting perspective of hindsight. *See Blum v. Witco,* 702 F.Supp. 493, 496 (D.N.J.1988).

Congress, in enacting 42 U.S.C. § 1988, made it clear that it understood that it was necessary to involve the private bar in employment discrimination cases. Indeed, the 1976 Fee Act was designed to create a sufficient supply of "private attorneys general" to meet the demand of civil rights plaintiffs who needed attorneys. As the evidence in this case demonstrates, to meet this demand, courts must make the under-

taking of civil rights plaintiffs' cases as lucrative as civil rights defense work, personal injury work or other related classes of cases. If such parity is not created, the members of the bar, all of whom have substantial overhead and other demands which require them to produce fees for work done, will continue to shy away from contingent cases, thereby leaving a class of discriminatees who cannot obtain representation.

12. *Awards in Similar Cases.*—Cases decided since *Delaware Valley II* further support the findings set forth above. In *Hidle v. Geneva County Board of Education*, 681 F.Supp. 752 (M.D.Ala.1988), the court, after carefully analyzing *Delaware Valley II* and the relevant market conditions in the State of Alabama, awarded plaintiffs an upward adjustment of one hundred percent (100%). Judge Thompson made the following specific findings of fact to support the enhancement:

> The circumstances necessary for a fee enhancement exist in this case. First of all, Hidle's attorneys took this case on a contingency fee basis because Hidle was unable to pay their fees and expenses. Secondly, lawyers in Alabama are definitely compensated for taking cases on a contingency basis. The market principle in this state is that lawyers who are to be compensated only in the event of victory expect and "are entitled to be paid more when successful than those who are assured of compensation regardless of the result." *Jones v. Diamond*, 636 F.2d 1364, 1382 (5th Cir.1981) (en banc). Thirdly, lawyers in Alabama who take cases on a contingency basis are very highly compensated for taking the risk that they will be paid only in the event of success. They expect to receive anywhere from 1.5 to 8 times the traditional hourly rate for non-contingency work, and it is not uncommon for fees in a successful contingency case to exceed $500 an hour.
>
> Most of the cases in which lawyers agree to contingency arrangements involve personal injury and debt collection. Very few lawyers in Alabama are, however, willing to undertake such arrangements in employment discrimination cases. This difference is for the most part due to the availability of substantial fee enhancement with the former cases, and the lack of such with the latter cases. The evidence before the court convincingly reflects that attorneys in the state are unwilling to undertake employment discrimination cases on a contingency basis because, in large part, they believe the cases are uneconomical; the fees they receive when successful are not high enough to justify taking the risk of losing such case, especially since there is plenty of other, more profitable work available. In fact, a substantial percentage of the lawyers that handled contingency-fee employment discrimination cases in the past have stopped doing so for this reason, and, as a result, there is a severe and critical shortage of civil rights lawyers—and more specifically plaintiff's employment discrimination lawyers—in this state. It is therefore very difficult, and becoming increasingly more difficult, for those who are alleged victims of employment discrimination and who cannot afford to pay the costs and fees of litigation, to get a lawyer.

*Id.* at 757 (footnote omitted). *See also Palmer v. Schultz*, 679 F.Supp. 68 (D.D.C. 1988) (fee enhanced by 50%); *Fadhl v. City & County of San Francisco*, 859 F.2d 649 (9th Cir.1988) (fee enhanced by 100%); *Black Grievance Committee v. Philadelphia Elec. Co.*, 690 F.Supp. 1393 (E.D.Pa. 1988) (200% enhancer found necessary to attract competent counsel to handle employment discrimination class actions); *Blum v. Witco Chemical Corp.*, 702 F.Supp. 493 (D.N.J.1988) (50% enhancement for contingency).

## III. COSTS AND EXPENSES

In addition to fees, the *Norwood* plaintiffs are entitled to recover costs and expenses related to this litigation. The affidavits of Jonathan Wallas (docket ## 123b, 128 and 138) show that the costs and expenses incurred by the *Norwood* plaintiffs' counsel from February 6, 1974, through July 31, 1986, total $58,152.39.

A large part of the expenses of the *Norwood* plaintiffs is a bill of Hoffman Research Associates ("HRA") of $48,363.82. This expense will not be awarded or denied at this time but held in abeyance pursuant to the suggestion of the parties as set forth. *See* I., *supra.* All other costs and expenses are itemized as follows:

Costs and Expenses through March 1982:

| | | |
|---|---:|---:|
| Filing Fee | $ 15.00 | |
| Service | 18.16 | |
| Depositions | 498.80 | |
| Transcript | 599.50 | |
| Witness Fees | 60.00 | |
| Telephone | 140.31 | |
| Xerox Copies | 385.64 | |
| Postage (Federal Express) Bus Packages | 32.01 | |
| Travel Expenses | 48.35 | |
| Microfilm | 235.85 | |
| Microview for Reproduction of Microfiche | 2,781.03 | |
| Dr. Toye Bird (Research) | 200.00 | |
| Additional Secretarial Assistance | 609.35 | |
| Rental Microfile Machine | 1,200.00 | $6,824.00 |

Costs and Expenses from 3/31/82 through 2/23/83:

| | | |
|---|---:|---:|
| Xerox Copies | $ 216.45 | |
| Postage | 15.89 | |
| Telephone | 29.40 | |
| Copies | 2.50 | $ 264.24 |

Costs and Expenses from 2/24/83 through 12/31/84:

| | | |
|---|---:|---:|
| Equal Employment Opportunity Commission | $ 92.25 | |
| Clerk Fee | 8.00 | |
| Telephone | 97.50 | |
| Xerox Copies | 955.00 | |
| Postage | 85.00 | |
| Travel | 646.81 | |
| Federal Express | 12.50 | |
| Printing | 6.50 | $1,903.56 |

Costs and Expenses from 1/1/85 through 6/30/86:

| | | |
|---|---:|---:|
| Photocopying | $ 464.50 | |
| Postage | 43.94 | |
| Special Courier | 62.50 | |
| Telephone | 96.61 | $ 667.55 |

Costs and Expenses from 7/1/86 through 7/31/86:

| | | |
|---|---:|---:|
| Photocopying | $ 119.80 | |
| Postage | 6.27 | |
| Telephone | 3.45 | $ 129.52 |
| | Total: | $9,788.87 |

---

The defendants, in their response to the *Norwood* plaintiffs' motion for counsel fees, costs, expenses and expert witness fees (docket # 137), do not object to any of these expenses. The defendants have not claimed that any of the expenses were excessive, unnecessary, or unrelated to the presentation of the case.

The court finds that all of the above listed expenses were reasonable, were necessary to the litigation of this case, and are compensable.

The *Norwood* plaintiffs request that the court award interest on the costs and expenses as they accrued. The *Norwood* plaintiffs contend that extensive costs and expenses were incurred in this case and have remained unpaid for many years and that an interest award is needed to make *Norwood* plaintiffs' counsel, who advanced the expenses, whole. The plaintiffs suggest that the court use the adjusted prime interest rate utilized by the National Labor Relations Board and the Internal Revenue Service.

At the hearing on September 9, 1986, plaintiffs' counsel informed the court that he could find no authority directly supporting an award of interest. Likewise, the defendants' counsel stated he could find no authority to the contrary.

In *Wheeler v. Durham City Board of Education,* 585 F.2d 618, 623 (4th Cir. 1978), the Fourth Circuit Court of Appeals held that an award of reasonable attorneys' fees under the Emergency School Aid Act of 1972, 20 U.S.C. § 1617, included litigation expenses. In *Daly v. Hill,* 790 F.2d 1071, 1084 (4th Cir.1986), the Fourth Circuit Court of Appeals held that a prevailing plaintiff is entitled to reasonable litigation expenses under 42 U.S.C. § 1988:

> [r]easonable attorneys fees under [§ 1988] must include reasonable expenses because attorneys' fees and expenses are inseparably intertwined as equally vital components of the costs of litigation. The factually complex and protracted nature of civil rights litigation frequently makes it necessary to make sizeable out-of-pocket expenditures which may be as essential to success as the intellectual skills of the attorneys. If these costs are not taxable, and the client, as is often the case, cannot afford to pay for them, they must be borne by counsel, reducing the fees award correspondingly.

790 F.2d at 1083 (4th Cir.1986) (quoting *Dowdell v. City of Apopka,* 698 F.2d 1181, 1190 (11th Cir.1983)).

In *Daly v. Hill* the court also said that attorneys' fees should be adjusted in some way to "counterbalance the effect of inflation and foregone interest on the value of the fee." 790 F.2d at 1081. The award of interest on litigation expenses is a reasonable corollary of that holding. Both the attorneys' fees and the litigation expenses borne by counsel should be adjusted in some way to compensate for the long delay in payment.

### IV. ORDER

IT IS THEREFORE ORDERED that:

1. Defendants shall pay counsel for the *Norwood* plaintiffs the following attorneys' fees: [3]

Attorney Fees before April 21, 1986:

| Attorney | Actual Hours—10% | Hourly Rate | Fee |
|---|---|---|---|
| Chambers | 537.15 −53.72 = 483.43 | $350 | $169,200.50 |
| Daly | 100.75 −10.08 = 90.67 | $300 | 27,201.00 |
| Belton | 9.50 −.95 = 8.55 | $280 | 2,394.00 |
| Wallas | 50.45 −5.05 = 45.40 | $280 | 12,712.00 |
| Winner | 3.75 −.38 = 3.37 | $250 | 842.50 |
| Nockleby | 360.95 −36.10 = 324.85 | $230 | 74,715.50 |
| Glazer | 269.00 −26.90 = 242.10 | $200 | 48,420.00 |
| Sumter | 9.75 −.98 = 8.77 | $180 | 1,578.60 |

Attorney Fees April 21, 1986—July 31, 1986:

| Attorney | Hours | Hourly Rate | Fee |
|---|---|---|---|
| Wallas | 43.30 | $140 | $ 6,062.00 |
| Watt | 1.00 | $140 | 140.00 |
| Gresham | 3.00 | $125 | 375.00 |
| Nockleby | 109.95 | $115 | 12,644.25 |
| Sumter | .25 | $ 90 | 22.50 |

Attorney Fee Total: $356,307.85

minus

(Sum paid by defendants pursuant to the ........ 120,103.19 April 29, 1987, order entered by the Honorable Sam J. Ervin, III.)

TOTAL: $236,204.66

2. Defendants shall pay the Ferguson law firm the following law clerk fees:

| Law Clerk | Reasonable Hours | Hourly Rate | Fee |
|---|---|---|---|
| Bynum | 14.50 | $40 | $ 580.00 |
| Tyler | 173.35 | $40 | 6,934.00 |
| Sampson | 182.80 | $40 | 7,312.00 |
| Nethercott | 52.50 | $40 | 2,100.00 |
| Lipkin | 72.00 | $40 | 2,880.00 |
| Moffet | 40.40 | $40 | 1,616.00 |
| McGrath | 56.30 | $40 | 2,252.00 |
| | | TOTAL: | $23,674.00 |

3. Defendants shall pay the Ferguson law firm for 977.30 hours of paralegal time at a rate of $35 per hour, for a total of $34,205.50.

4. Defendants shall pay interest on the fee awards from February 13, 1987, pursuant to 28 U.S.C. § 1961.

5. Defendants shall pay counsel for the *Norwood* plaintiffs $9,788.87, plus interest

**3.** The hours expended after the entry of the final judgment in the Stage I proceedings are calculated pursuant to the March 16, 1987, order concerning the method to be used in awarding fees for Stage II proceedings.

at the adjusted prime rate utilized by the National Labor Relations Board and the Internal Revenue Service, for costs and expenses. This figure does not include expert witness fees which are held in abeyance at this time.

6. The orders entered by the court on February 13, 1987, and February 20, 1987, are VACATED.